**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEANNE WITHROW,<br>*on behalf of herself and all persons similarly situated,*<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>*Defendants.* | Civil Action No. 1:25-cv-04073 |

**PLAINTIFF LEANNE WITHROW'S OPPOSITION TO MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

INTRODUCTION ...........................................................................................................1

FACTUAL BACKGROUND ...........................................................................................4

      A.     Plaintiff Leanne Withrow. ........................................................................4

              1.     Gender Identity. ............................................................................5

              2.     Transgender And Intersex People. ...............................................6

      C.     The Importance Of Transgender And Intersex Individuals Being Able To Use Restrooms Consistent With Their Gender Identity. .................................................7

      D.     Transgender And Intersex Federal Employees' Access To Restroom Facilities Before The Executive Order. ..........................................................8

      F.     Impact Of The Restroom Policy. ...........................................................10

LEGAL STANDARD..................................................................................................12

ARGUMENT ..............................................................................................................12

      I.     Ms. Withrow Has Article Iii Standing. ................................................12

              A.     The United States Is The Proper Defendant For Ms. Withrow's Personal Title VII Claims. ...........................................................13

              B.     Ms. Withrow Has Article III Standing To Sue All Defendants On Behalf Of A Class................................................................................13

              C.     Ms. Withrow Also Has Article III Standing To Sue All Defendants Because The United States, Its Departments, And Agencies Are A Single Entity.......................................................................................17

      II.     Venue Is Proper In This District. ...........................................................18

              A.     Venue Is Proper In This District Because The Relevant And Material Decisions Were Made Here. .........................................................18

              B.     Defendants' Cases Are Inapposite.............................................20

              C.     If The Court Finds That Venue Is Improper, This Case Should Be Transferred, Not Dismissed. ...................................................21

III.    Ms. Withrow States A Title VII Claim. ....................................................................22

    A.    The Restroom Policy Discriminates Against Ms. Withrow And Other Transgender Federal Employees Based On Sex In Violation Of Title VII. ..........................................................................................................22

        1.    Discrimination Based On Transgender Status Is Sex-Based Discrimination That Violates Title VII. .........................................23

        2.    The Restroom Policy Facially Discriminates Against Transgender Employees On The Basis Of Sex. ............................24

        3.    Defendants' Arguments That The Restroom Policy Does Not Discriminate Based On Sex Are Meritless. ..................................25

    B.    The Restroom Policy's Harm To Transgender Employees Constitutes An Adverse Employment Action Under Title VII......................................29

        1.    The Harm Caused By The Restroom Policy Satisfies The *Muldrow* Standard.........................................................................30

        2.    The Government's Arguments To The Contrary Are Meritless.......................................................................................32

    C.    Ms. Withrow Plausibly Alleges A Title Vii Claim Against All Defendants. ..............................................................................................34

IV.    Ms. Withrow's APA Claims Are Properly Before This Court. ............................36

CONCLUSION............................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,
75 F.4th 760 (7th Cir. 2023) ................................................................................................26

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967).............................................................................................................37

*Abdelhamid v. Lane Constr. Corp.*,
744 F. Supp. 3d 10 (D.D.C. 2024)......................................................................................30

*Adams by & through Kasper v. School Board of St. Johns County*,
57 F.4th 791 (11th Cir. 2022) .............................................................................................26

*Ahuruonye v. U.S. Dep't of Interior*,
312 F. Supp. 3d 1 (D.D.C. 2018)...................................................................................39, 40

*Al-Saffy v. Vilsack*,
827 F.3d 85 (D.C. Cir. 2016)...............................................................................................35

*Alves v. Harvard Pilgrim Health Care Inc.*,
204 F. Supp. 2d 198 (D. Mass. 2002), *aff'd*, 316 F.3d 290 (1st Cir. 2003).............................16

*Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*,
642 F.3d 1137 (D.C. Cir. 2011)......................................................................................12, 13

*Ani v. Zeldin*,
No. 1:24-CV-3328 (JMC), 2025 WL 3482732 (D.D.C. Dec. 4, 2025) .............................18, 21

*Arey v. Providence Hosp.*,
55 F.R.D. 62 (D.D.C. 1972)................................................................................................36

*Bain v. Off. of Att'y Gen.*,
648 F. Supp. 3d 19 (D.D.C. 2022) .......................................................................................33

*Barnes v. Costle*,
561 F.2d 983 (D.C. Cir. 1977).............................................................................................33

*Bostock v. Clayton County*,
590 U.S. 644 (2020)..................................................................................................... *passim*

*Bowen v. Mass.*,
487 U.S. 879 (1988)............................................................................................................37

*Brown v. Brody*,
   199 F.3d 446 (D.C. Cir. 1999) ........................................................................................30, 39

*Bundy v. Jackson*,
   641 F.2d 934 (D.C. Cir. 1981) ..............................................................................................33

*Cameron v. Blinken*,
   No. 22-cv-0031 (CRC), 2023 WL 5517368 (D.D.C. Mar. 22, 2023)......................................34

*Chambers v. District of Columbia*,
   35 F.4th 870 (D.C. Cir. 2022).............................................................................23, 30, 32, 33

*Czekalski v. Peters*,
   475 F.3d 360 (D.C. Cir. 2007) .........................................................................................22, 33

*Darby v. Cisneros*,
   509 U.S. 137 (1993).............................................................................................................37

*Darby v. Dep't of Energy*,
   231 F. Supp. 2d 274 (D.D.C. 2002) .....................................................................................21

*DeClue v. Cent. Ill. Light Co.*,
   223 F.3d 434 (7th Cir. 2000) (Rovner, J., dissenting) ............................................................32

*Desmarais v. Wright*,
   No. 23-1541 (LLA), 2026 WL 523022 (D.D.C. Feb. 25, 2026) ..............................................22

*Donnell v. Nat'l Guard Bureau*,
   568 F. Supp. 93 (D.D.C. 1983)............................................................................................21

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*,
   396 F.3d 1265 (D.C. Cir. 2005).............................................................................................37

*Ellis v. Noem*,
   No. CV 24-977 (EGS), 2025 WL 2732733 (D.D.C. Sept. 25, 2025) ......................................33

*Elmore v. Burrows*,
   No. 21-cv-02347 (JMC), 2022 WL 7458796 (D.D.C. Oct. 13, 2022)................................34, 35

*Ethnic Emps. of Libr. of Cong. v. Boorstin*,
   751 F.2d 1405 (D.C. Cir. 1985).............................................................................................39

*Figueroa v. Pompeo*,
   923 F.3d 1078 (D.C. Cir. 2019).............................................................................................22

*Fox v. Saginaw Cnty.*,
   67 F.4th 284 (6th Cir. 2023) .................................................................................................16

*Goldlawr, Inc. v. Heiman*,
    369 U.S. 463 (1962)............................................................................................21

*Grays v. Noem*,
    No. CV 24-1809 (LLA), 2025 WL 2643421 (D.D.C. Sept. 15, 2025)...................34

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020)....................................26

*Hampton v. Baldwin*,
    No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730 (S.D. Ill. Nov. 7, 2018) ...............................1

*Hawkins v. Haaland*,
    991 F.3d 216 (D.C. Cir. 2021) .............................................................................17

*Hazen Paper Co. v. Biggins*,
    507 U.S. 604 (1993)............................................................................................22

*Hinds v. PSEG Long Island LLC*,
    No. 23-CV-08701 (RER) (LGD), 2026 WL 266010 (E.D.N.Y. Feb. 2, 2026) .......................30

*Howard R.L. Cook & Tommy Shaw Found. for Black Emps. of the Libr. of Cong., Inc. v.
Billington*,
    737 F.3d 767 (D.C. Cir. 2013) .............................................................................17

*In Re: Administrative Subpoena No. 25-143-019*,
    800 F. Supp. 3d 229 (D. Mass. 2025) ...................................................................27

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v.
Johnson Controls, Inc.*,
    499 U.S. 187 (1991)......................................................................................26, 27

*James v. Booz–Allen*,
    227 F.Supp.2d 16 (D.D.C. 2002) .........................................................................21

*Johnson v. U.S. Dep't of Transp.*,
    No. 3:18-cv-02431-M, 2019 WL 7987679 (N.D. Tex. June 26, 2019) ..................20

*Jones v. Hagel*,
    956 F. Supp. 2d 284 (D.D.C. 2018) .....................................................................18

*Kafack v. Primerica Life Ins. Co.*,
    934 F. Supp. 3 (D.D.C. 1996)..............................................................................18

*L.A. Dept. of Water & Power v. Manhart*,
    435 U.S. 702 (1978)......................................................................................26, 27

*La Mar v. H & B Novelty & Loan Co.*,
    489 F.2d 461 (9th Cir. 1973) ........................................................................................15

*Macy v. Holder*,
    EEOC Appeal No. 0120120821, 2012 WL 1435995 (Apr. 20, 2012) ....................................23

*Mahon v. Ticor Title Ins. Co.*,
    683 F.3d 59 (2d Cir. 2012) ...........................................................................................16

*McCone v. Pitney Bowes, Inc.*,
    582 F. App'x 798 (11th Cir. 2014) .....................................................................................32

*Miller v. Insulation Contractors, Inc.*,
    608 F. Supp. 2d 97 (D.D.C. 2009) ....................................................................................18

*Moore v. Comfed Sav. Bank*,
    908 F.2d 834 (11th Cir. 1990) ...................................................................................14, 16

*Mudd v. Busse*,
    68 F.R.D. 522 (N.D. Ind. 1975) ......................................................................................14

*Muldrow v. City of St. Louis*,
    601 U.S. 346 (2024) .................................................................................................. *passim*

*Muldrow v. Garland*,
    Civ. A. No. 20-2958 (APM), 2021 WL 6844248 (D.D.C. Oct. 26, 2021) ..................21, 30, 31

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998) ...............................................................................................25, 29, 30

*Payton v. Cnty. of Kane*,
    308 F.3d 673 (7th Cir. 2002) ...............................................................................3, 14, 15, 16

*PFLAG, Inc. v. Trump*,
    766 F. Supp. 3d 535 (D. Md. 2025) .....................................................................................2

*Ramos Martinez v. Puerto Rico*,
    No. 07-2026 (DRD), 2011 WL 13351065 (D.P.R. Feb. 15, 2011) (Lopez,
    Mag. J.) ..............................................................................................................30, 31

*Richardson v. Am. Sec. Programs, Inc.*,
    59 F. Supp. 3d 195 (D.D.C. 2014) ....................................................................................16

*Richardson v. Nat'l R.R. Passenger Corp.*,
    No. 24-2517 (SLS), 2025 WL 1568198 (D.D.C. June 3, 2025) .............................................32

*Roberts v. Clark Cnty. Sch. Dist.*,
    215 F. Supp. 3d 1001 (D. Nev. 2016) ...........................................................................30, 31

*Robinson v. Potter*,
No. Civ. A. 04-0890 (RMU), 2005 WL 1151429 (D.D.C. May 16, 2005) ............................20

*Seneca v. Price*,
257 F. Supp. 3d 95 (D.D.C. 2017) ......................................................................................39

*Spirides v. Reinhardt*,
613 F.2d 826 (D.C. Cir. 1979) ...........................................................................................35

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940)...........................................................................................................17

*T.B., Jr. ex rel. T.B. v. Prince George's Cty. Bd. of Educ.*,
897 F.3d 566 (4th Cir. 2018) ...............................................................................................1

*Talbott v. United States*,
775 F. Supp. 3d 283 (D.D.C. 2025) ....................................................................................27

*Teran-Sanchez v. Stream Realty Partners, L.P.*,
No. 23-CV-3189 (DLF), 2024 WL 4215673 (D.D.C. Sept. 17, 2024)..................................23

*Troster v. Garland*,
No. CV 20-3584 (BAH), 2021 WL 5865447 (D.D.C. Dec. 10, 2021)..................................20

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) (Kavanaugh, J., concurring) ..............................................................35

*Tuan Anh Nguyen v. I.N.S.*,
533 U.S. 53 (2001)............................................................................................................26

*United States v. AT&T*,
461 F. Supp. 1314 (D.D.C. 1978) ......................................................................................18

*United States v. I.C.C.*,
221 F. Supp. 584 (D.D.C. 1963) ........................................................................................18

*United States v. Trucking Emps., Inc.*,
75 F.R.D. 682 (D.D.C. 1977)..............................................................................................15

*United States v. Virginia*,
518 U.S. 515 (1996)...........................................................................................................26

*Vasser v. McDonald*,
72 F. Supp. 3d 269 (D.D.C. 2014) .................................................................................19, 20

*Washington v. Trump*,
768 F. Supp. 3d 1239 (W.D. Wash. 2025)..........................................................................27

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
　858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds as recognized by*
　*Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) ...............................................26

*Wiley v. Glassman*,
　511 F.3d 151 (D.C. Cir. 2007) ...............................................................................29

*Williams v. GEICO Corp.*,
　792 F. Supp. 2d 58 (D.D.C. 2011) ...........................................................................12

*Wilson v. Noem*,
　No. 20-cv-100 (GMH), 2025 WL 1000666 (D.D.C. Apr. 3, 2025) .........................................33

*Xia v. Tillerson*,
　865 F.3d 643 (D.C. Cir. 2017) ...............................................................................12

## Statutes

5 U.S.C. §§ 703, 704 ............................................................................. *passim*

10 U.S.C. § 10508 ............................................................................3, 13, 17, 34

28 U.S.C. § 1404 ..........................................................................................21

42 U.S.C. § 2000e-2 ...............................................................................22, 27, 38

42 U.S.C. § 2000e–5 .......................................................................................18

42 U.S.C. § 2000e-16 ............................................................................2, 13, 22, 34

## Rules

Fed. R. Civ. P. 12(b)(1) ...............................................................................12, 13

Fed. R. Civ. P. 12(b)(3) ...................................................................................12

Fed. R. Civ. P. 12(b)(6) ...................................................................................12

Fed. R. Civ. P. 23 ......................................................................................35, 36

Fed. R. Civ. P. 45 .........................................................................................18

**Other Authorities**

29 C.F.R. 1910.141(c)(1) ..................................................................................................27

7AA Charles Alan Wright et al., *Federal Practice & Procedure* § 1785.1 (3d ed. 2011) ...........................................................................................................................15

Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ..................................................................................................... *passim*

Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 SEXUALITY RSCH. & SOC. POL'Y 70, 81 (2018), https://perma.cc/U52D-W7C .......................................................8

Federal Management Regulation: Nondiscrimination Clarification in the Federal Workplace, 81 Fed. Reg. 55148 (Aug. 18, 2016) .................................................8, 9

Jody Herman et al., *Safety and Privacy in Public Restrooms and Other Gendered Facilities*, WILLIAMS INSTITUTE, UCLA SCHOOL OF LAW 1 (2025), https://perma.cc/G6H9-T3WK) ........................................................................................7

Brooke Migdon, *Trump Once Said Trans People Should Be Able to 'Use the Bathroom They Feel Is Appropriate.' Where He Stands 10 Years Later*, PEOPLE, https://bit.ly/4d0jnnk (Apr. 23, 2026) ........................................................................28

Justice Sandra Day O'Connor, *"Out of Order" At The Court: O'Connor on Being the First Female Justice*, NPR (Mar. 5, 2013), https://perma.cc/QC2A-ZDWY ....................32

**INTRODUCTION**

Plaintiff LeAnne Withrow (Ms. Withrow) is a transgender woman who served her country in uniform as a decorated staff sergeant in the Illinois National Guard. Since August 2016, she has served as a civilian federal government employee in the Illinois National Guard, part of the National Guard Bureau of the Department of Defense. Through three Presidential administrations, including President Trump's first term, Ms. Withrow and every other transgender and intersex employee of the federal government was able to use restrooms consistent with their gender identity. Their right to do so was enshrined in 2016 guidance in the Federal Register by Defendant General Services Administration ("GSA") and in a 2017 directive from Defendant Office of Personnel Management ("OPM"). But that all changed in January 2025, when on the first day of his second term President Trump issued Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025), entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Executive Order").[1]

The Executive Order repudiates the very existence of transgender and intersex people by adopting a biologically incoherent definition of sex and proclaiming that possessing a gender identity incongruent with a person's sex assigned at birth is a "false claim." Executive Order § 2(a)-(f). One "cannot fathom discrimination more direct than the plain pronouncement of a policy

---

[1] Defendants and their amici consistently refer to Ms. Withrow as "he", "him" and "Mr.". Courts have denounced such misgendering. *T.B., Jr. ex rel. T.B. v. Prince George's Cty. Bd. of Educ.*, 897 F.3d 566, 577 (4th Cir. 2018) (describing student's harassment of transgender female teacher by referring to her with male gender pronouns as "pure meanness"); *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *2 (S.D. Ill. Nov. 7, 2018) (referencing expert testimony that "misgendering transgender people can be degrading, humiliating, invalidating, and mentally devastating"). If counsel's use of pronouns is purportedly constrained by the President's Executive Order, they could refer to Ms. Withrow as "Plaintiff" or "Withrow" without using a pronoun, which would better accord with counsel's duty to "treat all participants in the legal process, including . . . Parties . . . in a civil, professional, and courteous manner" and not to "engage in offensive conduct directed toward other participants in the legal process." Local Civil Rules, App. A (D.C. Bar Voluntary Standards for Civility in Professional Conduct) at ¶¶ 1, 3; *see also* LCvR 83.8(b)(6)(v) (requiring that all members of the Bar of this Court be familiar with these standards).

resting on the premise that the group to which the policy is directed does not exist." *PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535, 569 (D. Md. 2025).

And the Executive Order went beyond denying the existence of transgender and intersex people, with very real and devastating consequences for federal employees. Following the Executive Order's directive, Defendants OPM and GSA and agencies and departments across the executive branch, including the Department of Defense and Illinois National Guard, required that restrooms "designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity." Compl. ¶¶ 153, 158, 159, 161, 163, 166. Now, Plaintiff, like all other transgender federal employees, is prohibited from using the restroom that aligns with her gender identity. This has caused concrete harm to Ms. Withrow and members of the class. Using a men's restroom would not only disclose Plaintiff's transgender status to anyone she encountered in or near the restroom, but also cause her to "feel unsafe, humiliated, and degraded." *Id.* ¶ 178. To limit her need to use the restroom, Ms. Withrow almost never eats breakfast, rarely eats lunch, and drinks less than the equivalent of one 17 oz. bottle of water on most days. *Id*. ¶¶ 14, 176.

To remedy these harms, Ms. Withrow exhausted her administrative remedies at the EEOC and brought this lawsuit challenging the actions the government took to implement the Executive Order under Title VII and the Administrative Procedure Act (APA). Defendants' actions to implement the Executive Order violate Title VII because discrimination based on transgender or intersex status is discrimination "based on . . . sex." 42 U.S.C. § 2000e-16(a). The actions of OPM and GSA also violate the APA as they are final agency actions "not in accordance with law" and are arbitrary and capricious because they reverse longstanding government policies with no explanation or justification. Ms. Withrow and the putative class seek declaratory and permanent injunctive relief requiring Defendants (including their contractors, employees, and agents) to

provide and continue providing Ms. Withrow and the putative class members access to restrooms at their workplaces that align with their gender identities and prohibiting Defendants from implementing policies that would restrict that access. They also seek relief under the APA declaring the final agency actions of OPM and GSA unlawful and vacating them to provide protection when they use government office buildings outside their workplace.

Defendants move to dismiss on four grounds. All lack merit.

First, Defendants argue that Ms. Withrow lacks Article III standing to bring Title VII claims on behalf of the class against any defendant other than her employer. This argument ignores that when a plaintiff brings a class action the proper inquiry is whether the plaintiff class was injured by the defendants; indeed, Defendants' entire motion appears to ignore that this case is a putative class action. Defendants sought to stay briefing on the Motion to Certify Class, *see* ECF No. 23; Minute Order (Jan. 16, 2026), but now attempt to use that stay as a sword to seek dismissal of the case before the Court can consider class certification. Defendants cannot have it both ways. Rather, "if all the defendants took part in a similar scheme that was sustained either by a contract or conspiracy, or was mandated by a uniform state rule, it is appropriate to join as defendants even parties with whom the *named* class representative did not have direct contact." *Payton v. Cnty. of Kane*, 308 F.3d 673, 675 (7th Cir. 2002) (emphasis in original) (collecting cases). And in any event, Ms. Withrow is a civilian employee of the National Guard, and a National Guard-specific statute provides that the United States is the proper Defendant in a Title VII case. 10 U.S.C. § 10508(b)(3)(C). If Ms. Withrow has Article III standing to sue the United States, she also as Article III standing to sue its component departments and agencies (or their leaders in their official capacities) because the United States and its components are properly treated as a single unit.

Second, Defendants argue that venue for the Title VII claim is improper in this district. But

venue is proper where the material decisions concerning the discriminatory conduct took place, and the Complaint alleges those decisions were made in this district. The fact that decisions made in the District of Columbia were implemented elsewhere does not destroy venue here.

Third, contrary to Defendants' assertions, Plaintiff states a Title VII claim because Supreme Court precedent dictates that discrimination against transgender employees necessarily constitutes sex-based discrimination under that statute. Per *Bostock v. Clayton County*, 590 U.S. 644 (2020), Ms. Withrow faces a harm she would not face but for her sex assigned at birth. Precedent from the Supreme Court and this Circuit shows that the harm Ms. Withrow alleges is actionable under Title VII, and Ms. Withrow properly sued all Defendants in this case, not just the head of the Illinois National Guard, because she brings a class action alleging a government-wide policy that causes identical harm to employees across every federal department and agency.

Fourth, Ms. Withrow states an APA claim—and Defendants err in asserting that it is foreclosed by her Title VII claim, because the two claims present distinct legal issues and require different relief. To obtain a complete remedy, Ms. Withrow needs relief from the final agency actions of OPM and the GSA, not just access to restrooms at her Illinois National Guard workplace under Title VII. Relief is available under the APA because there is no "adequate remedy" for her harms under Title VII.

The Court should deny the motion to dismiss.

## FACTUAL BACKGROUND

### A.    Plaintiff LeAnne Withrow.

Ms. Withrow is a transgender woman who has served since August 2016 as a civilian federal government employee in the Illinois National Guard, which is part of the Defendant National Guard Bureau of the Defendant Department of Defense. Compl. ¶¶ 26- 27. Since September 2021, she has served as the Title 5 Lead Military and Family Readiness Specialist. *Id.*

¶ 28. Ms. Withrow has been recognized for her outstanding performance in these roles: She received a Sustained Superior Performance commendation from the Adjutant General of the Illinois National Guard in 2019 and another Superior Performance commendation from the Adjutant General in 2022. *Id.* ¶ 29. She is stationed at Camp Lincoln in Springfield, Illinois. *Id.*¶ 28.

Until 2023, Ms. Withrow served her country as a staff sergeant in the Illinois Army National Guard, where she was a Chief Public Affairs Noncommissioned Officer. *Id.* ¶ 24. Throughout her military career, Ms. Withrow participated in many major exercises and notable events around the world. *Id.* Her military decorations include the Meritorious Service Medal, Army Commendation Medal, Joint Meritorious Unit Award, Army Achievement Medal with two Oak Leaf Clusters, Army Reserve Component Achievement Medal with three Oak Leaf Clusters, National Defense Service Medal, Global War On Terrorism Expeditionary Medal, Global War on Terrorism Service Medal, Armed Forces Reserve Medal with Bronze Hourglass and M Device, and Illinois National Guard Abraham Lincoln Medal Of Freedom. *Id.* ¶ 25

Ms. Withrow came out as transgender in 2016, shortly after the first ban on transgender military service members was lifted. *Id.* ¶ 26. Ms. Withrow became the first openly transgender Illinois National Guard Soldier, and, in November 2019, her corrected gender was recognized in the Defense Enrollment Eligibility Reporting System. *Id.*

**B.    Gender Identity and Transgender and Intersex People.**

**1.    Gender Identity.**

Gender identity is a person's fundamental, internal sense of themselves as male, female, a blend of both, or neither. *Id.* ¶ 121. There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and

well-being. *Id.*

"Sex assigned at birth" refers to the designation of sex generally noted on a person's birth certificate shortly after birth, almost always based on the appearance of an infant's external genitalia. *Id.* ¶ 120. The term "biological sex" is less precise than "sex assigned at birth" because it does not account for variations among the different biological components of sex within a particular person, which include not only gender identity, but also chromosomes, gonads (glands that produce hormones and gametes), other anatomy (internal and external reproductive parts), and secondary sex characteristics. *Id.*

### 2.   Transgender and Intersex People.

Transgender people have a gender identity that differs from their sex assigned at birth—which, as noted above, is an assignment typically based only upon external genital anatomy. *Id.* ¶ 122. A transgender woman is a person who was designated as male sex at birth but has a female gender identity; a transgender man is a person who was designated as female at birth but has a male gender identity. *Id.*

Intersex people, or people with "differences of sexual development," are born with a combination of sex characteristics—including chromosome patterns, hormone production or response, internal reproductive organs, or external genitalia—that do not fit typical binary notions of male or female bodies. *Id.* ¶ 123. Some intersex traits may be discovered at birth, some may not be discovered until puberty, and some may never be discovered. *Id.* Some intersex variations cause intersex people to produce neither sperm nor ova, or produce one or the other, but to have external genitalia typically associated with the "opposite" sex. *Id.* Like transgender individuals, most intersex people are assigned a binary sex designation at birth based solely on external genitalia. *Id.* ¶ 124. Some intersex people have a gender identity that matches their sex assigned at birth.

Others do not and may identify as transgender in addition to being intersex. *Id.*.

> **C.    The Importance of Transgender and Intersex Individuals Being Able To Use Restrooms Consistent with Their Gender Identity.**

Gender dysphoria is a medically recognized condition defined by a marked incongruence between a person's gender identity and the sex they were assigned at birth. *Id.* ¶ 132. The recognized standard of care for gender dysphoria, supported by all major medical associations and reflecting the professional consensus, includes social affirmation; thus, treatment for gender dysphoria typically includes living one's life consistently with one's gender identity, including using restrooms that reflect one's gender identity. *Id.* ¶ 133.

Because transgender people typically present themselves publicly in a way that is consistent with their gender identity, rather than with their sex assigned at birth, using a restroom that does not align with their gender may result in others perceiving them as entering "the wrong restroom." *Id.* ¶ 136. Thus, when transgender people use restrooms that are not consistent with their gender, they are more likely to be verbally harassed for doing so, or even physically blocked from accessing the facility. *Id.* (citing Jody Herman et al., *Safety and Privacy in Public Restrooms and Other Gendered Facilities*, WILLIAMS INSTITUTE, UCLA SCHOOL OF LAW 1 (2025), https://perma.cc/G6H9-T3WK).

Preventing transgender individuals from accessing facilities consistent with their gender identity can affect their physical health in other serious ways. *Id.* ¶ 137. Nearly one-third of transgender people report that they limited the amount they ate or drank at least once in the previous year so they did not need to use a public restroom. *Id.* Fifty-four percent of transgender individuals have reported physical problems from avoiding restrooms at work or in public, including dehydration and continence issues. *Id.* Eight percent of transgender individuals reported having a kidney or urinary tract infection, or another kidney-related medical issue because they

avoided restrooms. *Id*. Intersex individuals suffer the same harms to their physical and mental health as transgender individuals when prevented from using restrooms that align with their gender identity. *Id.* ¶ 139.

There is no credible evidence whatsoever that transgender people accessing restrooms aligning with their gender identity jeopardizes the safety or privacy of other users of those restrooms, and academic scholarship confirms that "fears of increased safety and privacy violations" are not empirically grounded. *Id*. ¶ 138 (citing Herman et al., *supra*; Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 SEXUALITY RSCH. & SOC. POL'Y 70, 81 (2018), https://perma.cc/U52D-W7C).

### D.      Transgender and Intersex Federal Employees' Access to Restroom Facilities Before the Executive Order.

On August 8, 2016, GSA, which is responsible for the management of federal properties, issued GSA Bulletin 2016-B to the heads of all federal agencies. *Id.* ¶ 143. GSA recognized that "the prohibition against sex discrimination in the Federal Management Regulation [41 CFR part 102-74, section 102-74.445] also prohibits discrimination due to gender identity, which includes discrimination based on an individual's transgender status." *Id*. (quoting Federal Management Regulation: Nondiscrimination Clarification in the Federal Workplace, 81 Fed. Reg. 55148 (Aug. 18, 2016)).

The GSA directive specifically addressed access to restroom facilities and required that transgender federal employees be permitted to use a restroom consistent with their gender identity without being forced to use single-occupancy restrooms:

> Federal agencies occupying space under the jurisdiction, custody, or control of GSA must allow individuals to use restroom facilities and related areas consistent with their gender identity. . . . Further,

> Federal agencies may not restrict only transgender individuals to only use single-occupancy restrooms, such as family or accessible facilities open to all genders.

*Id.* ¶ 144 (quoting Federal Management Regulation: Nondiscrimination Clarification in the Federal Workplace, 81 Fed. Reg. 55148 (Aug. 18, 2016)).

In accordance with this GSA directive, transgender and intersex federal employees had access to restrooms and other facilities consistent with their gender identity through the first Trump administration and the Biden administration. *Id.* ¶ 145. Implementation of and compliance with the 2016 GSA directive did not interfere with effective and efficient government operations or harm any non-transgender or non-intersex employees that shared restrooms and other facilities with their transgender or intersex colleagues. *Id.* ¶ 148.

While GSA is responsible for the operation of federal properties, *id.* ¶ 6, OPM is responsible for federal personnel policies. *Id.* ¶ 114. In 2017, OPM issued *Guidance Regarding the Employment of Transgender Individuals in the Federal Workplace*, which directed that agencies must allow employees to use restrooms "consistent with the employee's gender identity." *Id.* ¶ 146. In 2023, following *Bostock*, 590 U.S. 644, which held that Title VII's prohibition on sex discrimination includes discrimination on the basis of gender identity and sexual orientation, OPM updated its *Guidance Regarding the Employment of Transgender Individuals in the Federal Workplace*. *Id.* ¶ 147. This 2023 OPM directive stated that "agencies should allow access to common and single-user restrooms and other facilities corresponding to an employee's gender identity. . . . Agencies should not limit an employee to use facilities that are located at an unreasonable distance from the employee's work station, or inconsistent with the employee's gender identity." *Id.*

-9-

### E.    The Executive Order and OPM Implementation Guidance.

On January 20, 2025, President Trump issued the Executive Order, which directs federal agencies to "tak[e] appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity." *Id*. ¶ 8.

On January 29, 2025, Defendant Charles Ezell, Acting Director of Defendant U.S. Office of Personnel Management, issued a memorandum (the "Ezell Memorandum") providing guidance regarding the Executive Order. Compl. ¶ 158. The Ezell Memorandum directed each of the heads and acting heads of departments and agencies of the federal government, to—no later than 5:00 p.m. EST on January 31, 2025—"[e]nsure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity." *Id*. On July 10, 2025, Defendant Ezell issued a second memorandum (together with the January 29 memorandum, the "OPM Memoranda"), which reiterated that agencies should already have taken steps based on the Ezell Memorandum, including having ensured that restrooms are "designated by biological sex and not gender identity." *Id*. ¶ 159. In short order, agencies throughout the federal government, including the Illinois National Guard, implemented OPM's directive (collectively, the "Agency Implementation Actions"). *Id*. ¶¶ 162-167 (describing the Department of Defense, National Guard Bureau, and Illinois National Guard implementation memoranda and "similar actions taken by agencies across the Executive Branch to implement the Executive Order and OPM Memoranda").

In May 2025, GSA published a Federal Register notice (the "GSA Recission") withdrawing its 2016 directive that federal agencies using space managed by GSA must allow individuals to use restrooms consistent with their gender identity. *Id*. ¶ 161.

### F.    Impact of the Restroom Policy.

The Agency Implementation Actions and the GSA Rescission (together, "the Restroom

Policy") have caused Ms. Withrow to suffer physical and emotional distress and have limited her ability to effectively perform her job and serve the soldiers of the Illinois National Guard and their families. *Id.* ¶ 177. Ms. Withrow is a woman, dresses like a woman, and is perceived as a woman by people who interact with her. *Id.* ¶ 136. Prior to the Executive Order and its implementation via the OPM Memoranda, GSA Recission, and Agency Implementation Actions, Ms. Withrow used the women's restrooms at her Camp Lincoln workplace, other National Guard facilities, and other federal buildings without issue. *Id.* ¶ 13.

Now, because the Restroom Policy prohibits Ms. Withrow from using the women's restroom at National Guard facilities and other federal buildings, she is frequently without any usable restroom. Using a men's restroom would not only disclose her transgender status but also cause her to "feel unsafe, humiliated, and degraded." *Id.* ¶ 178. Individuals seeing her enter a men's restroom might try to prevent her from doing so or physically harm her, as has happened to other transgender people. *Id.* There is only one single-user restroom available for Ms. Withrow's use on the entire 160-acre campus of Camp Lincoln, the Illinois National Guard Headquarters where she works, and eight of the twelve National Guard field offices in Illinois that she is required to visit regularly to supervise other employees in her department have no single-user restroom. *Id.* ¶¶ 170, 173. Even where single-user restrooms are present, their more limited availability creates logistical problems that interfere with Ms. Withrow's job performance. *Id.* ¶¶ 170-74.

The Restroom Policy has caused Ms. Withrow to suffer logistical difficulties as well as physical and emotional distress, all of which have limited her ability to effectively perform her job and serve the soldiers of the Illinois National Guard. *Id.* ¶ 177. These circumstances force Ms. Withrow to limit her need to use the restroom by carefully monitoring and controlling her food and liquid intake while working. *Id.* ¶¶ 175-76. Ms. Withrow starves herself, skipping breakfast

almost every day and generally lunch as well. *Id.* ¶ 14. She also dehydrates herself—most days drinking a single cup of coffee and drinking as little water as possible—putting her physical health at risk. *Id.*

## LEGAL STANDARD

Similar standards apply when considering motions to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), for improper venue under Rule 12(b)(3), and for failure to state a claim under Rule 12(b)(6). When evaluating a motion under Rule 12(b)(1), the court is required to "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up). In considering a motion under Rule 12(b)(3) a "court accepts the plaintiff's well-pleaded factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor." *Williams v. GEICO Corp.*, 792 F. Supp. 2d 58, 62 (D.D.C. 2011). And when evaluating a motion under Rule 12(b)(6), the Court must "treat the complaint's factual allegations as true and must grant the plaintiff[] the benefit of all inferences that can be derived from the facts alleged." *Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up).

## ARGUMENT

### I.    MS. WITHROW HAS ARTICLE III STANDING.

Defendants argue that, because Ms. Withrow is a civilian employee of the Illinois National Guard, the only proper defendant for her Title VII claims is the Illinois National Guard, and she lacks Article III standing to assert Title VII claims against any other defendant. Defendants are wrong: the proper Title VII defendant is the United States, not the Illinois National Guard (or its leader, its Adjutant General), and there is no basis to dismiss class claims under Title VII against

other defendants on the basis of Article III standing. When reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court is required to "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co.*, 642 F.3d at 1139 (cleaned up).

### A. The United States Is the Proper Defendant for Ms. Withrow's Personal Title VII Claims.

Defendants argue that, because Ms. Withrow is a civilian employee of the Illinois National Guard, the only proper defendant is the Illinois National Guard. Mot. at 7. Defendants ignore 10 U.S.C. § 10508, which specifically covers suits by civilian National Guard employees and provides that the United States should be named as the defendant in any Title VII suit by such an employee. Specifically, the statute states that "[i]n any civil action or proceeding brought in any court arising from an action under this section, the United States shall be the sole defendant or respondent," 10 U.S.C. § 10508(b)(3)(C), whereas the "National Guard of the jurisdiction concerned" is the proper defendant only in an "administrative action," i.e., "any administrative complaint, grievance, claim, or action arising from or relating to . . . a personnel action or condition of employment," *id.* § 10508(b)(3), (b)(3)(A). Accordingly, after Ms. Withrow exhausted her administrative remedy before the EEOC, the United States became the proper defendant for Ms. Withrow's personal Title VII claim filed in federal court.

### B. Ms. Withrow Has Article III Standing To Sue All Defendants On Behalf Of A Class.

With the exception of suits by civilian National Guard employees discussed above, Title VII requires federal employee plaintiffs to name as defendants "the head of the department, agency, or unit, as appropriate." 42 U.S.C. § 2000e–16(c). To obtain complete relief for all class members, Ms. Withrow has named as the "Title VII Defendants" the heads of such departments, agencies, and units in their official capacity. Compl. ¶¶ 30–112. Defendants concede that Ms.

-13-

Withrow has Article III standing to pursue her APA claims against OPM and GSA. Mot. at 5. Their argument that she lacks Article III standing to pursue Title VII claims against other federal agencies, Mot. at 6–7, ignores the class action context of this case.

In class actions where the named plaintiffs are injured only by some of the defendants, for purposes of standing, "the real issues are whether the plaintiff class was injured by the defendants, and if so, whether the claims of the proposed named plaintiffs are representative." *Payton v. Cnty. of Kane*, 308 F.3d 673, 679 (7th Cir. 2002). In *Payton*, six named plaintiffs sued nineteen Illinois counties for charging a bail fee in accordance with a state law. *Id.* at 675. Only two of the nineteen counties, however, charged the named plaintiffs. The other seventeen counties had no relationship or prior dealings with any of the named plaintiffs. *Id.*

The court observed that many cases from different jurisdictions "have suggested that if all the defendants took part in a similar scheme that was sustained either by a contract or conspiracy, or was mandated by a uniform state rule, it is appropriate to join as defendants even parties with whom the *named* class representative did not have direct contact." *Id.* at 679 (emphasis in original) (collecting cases); *cf. Moore v. Comfed Sav. Bank*, 908 F.2d 834, 838 (11th Cir. 1990) (holding that defendant banks that did not hold loans of the named plaintiffs were properly joined where statute required "common action by the defendants"); *Mudd v. Busse*, 68 F.R.D. 522, 527–28 (N.D. Ind. 1975) (collecting cases permitting class claims against defendants against whom "no named plaintiff would have personal claims" where defendants were all officials "charged with enforcing or uniformly acting in accordance with a state statute, or common rule or practice of state-wide application"). Here, the "uniform . . . rule," *Payton*, 308 F.3d at 679, came directly from the highest level of the federal government and left defendant agencies with no discretion to deviate from it.

This analytical approach—known as the juridical link doctrine— has been adopted by the

Seventh and Ninth Circuits. It provides that, where "the plaintiffs as a group—named and unnamed—have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or otherwise 'juridically related in a manner that suggests a single resolution of the dispute would be expeditious,' the claim can go forward." *Payton*, 308 F.3d at 679 (quoting *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973)). *See generally* 7AA Charles Alan Wright et al., *Federal Practice & Procedure* § 1785.1 (3d ed. 2011) ("An exception to [the rule that at least one named plaintiff must have standing vis-à-vis each named defendant] has been made in several cases in which the defendant class was composed of public officials, however. In these cases standing has been found even though the representative was injured by the conduct of only one of the officials because the court determined that the defendants were so closely related that they should be treated substantially as a single unit.") (footnote omitted) (collecting cases).

This Court has previously recognized the juridical link doctrine in the context of a defendant class action where it determined that, because "agreements bind the employment practices of the entire [defendant] class in certain crucial respects," "under these circumstances the court believes that 'all defendants are juridically related in a manner that suggests a single resolution of the [entire] dispute would be expeditious.'" *United States v. Trucking Emps., Inc.*, 75 F.R.D. 682, 689–90 (D.D.C. 1977) (second alteration in original) (quoting *La Mar*, 489 F.2d at 466). While *Trucking Employers* involved a defendant class rather than individually named defendants, there is no reason why Article III requires a different result here, where the Executive Order, OPM Memoranda, and GSA Recission work together like a "statute requiring common action by the defendants," resulting in the Agency Implementation Actions across the executive branch and thereby establishing the same juridical link recognized to be "appropriate to join as a

-15-

defendant a party with whom the named class representative did not have a direct contact." *Moore*, 908 F.2d at 838; *see also Alves v. Harvard Pilgrim Health Care Inc.*, 204 F. Supp. 2d 198, 205 (D. Mass. 2002) (holding that plaintiffs had standing to represent beneficiaries of ERISA plans with different sponsors when the defendants were all wholly owned subsidiaries of the same company, and the provisions of the plans were substantially the same), *aff'd*, 316 F.3d 290 (1st Cir. 2003) .[2]

In this case, Defendants do not contest Ms. Withrow's standing to assert her personal Title VII claim against the proper defendant (that is, the United States). Rather, Defendants challenge Ms. Withrow's standing to sue other agencies of the United States who are juridically linked because all are required to follow the Executive Order, the OPM Guidance, and the GSA Recission. In this case, the proposed class is:

> All current and future civilian employees of the named defendants and their agencies whose gender identity differs from their "biological classification as either male or female" as defined in EO 14168 and who have been or will be prevented from using restrooms that align with their gender identity.

Compl. ¶ 183. This putative class can establish standing against all Defendants. The class has been prohibited from using restrooms that align with their gender identity, directly resulting in class members having to experience present and continuing emotional distress and physical discomfort. *See* Compl. ¶¶ 180–81, 189. The class can establish causation by showing that the OPM Memoranda and GSA Recission directly caused the Agency Implementation Actions. Compl. ¶¶ 180–81; *see Richardson v. Am. Sec. Programs, Inc.*, 59 F. Supp. 3d 195, 200 (D.D.C. 2014).

---

[2] The Second and Sixth Circuits have held that plaintiffs lack Article III standing despite the existence of a juridical link among defendants, at least in some circumstances. *See Fox v. Saginaw Cnty.*, 67 F.4th 284 (6th Cir. 2023); *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59 (2d Cir. 2012). *But see Mahon*, 683 F.3d at 66–69 (Hall, J., concurring) (standing would have been appropriate under the juridical link doctrine in a case involving "government employees who *had* to follow a uniform state policy" (emphasis in original) (footnote omitted)). This Court is not bound by these cases, whose approach is less persuasive than the Seventh Circuit's *Payton* decision and this Court's own decision in *Trucking Employers*.

Finally, the class can show redressability, in that permanent injunctive and declaratory relief would reverse Defendants' designation of restrooms by biological sex and allow the class members to use the restrooms that align with their gender identity, thereby redressing their injuries. Compl. ¶¶ 180–81, 189; *see Hawkins v. Haaland*, 991 F.3d 216, 224 (D.C. Cir. 2021); *cf. Howard R.L. Cook & Tommy Shaw Found. for Black Emps. of the Libr. of Cong., Inc. v. Billington*, 737 F.3d 767, 770–71 (D.C. Cir. 2013) (explaining that a ruling in plaintiffs' favor that would allow them to attain benefits that were previously denied established redressability).

Ms. Withrow agreed, at Defendants' request, to defer resolution of her motion for class certification until the motion to dismiss was decided. ECF No. 23. But no purpose would be served by dismissing the other agency defendants only to have the class certified and for Ms. Withrow to then file an amended complaint adding back the dismissed agency defendants and the Title VII claims against them.

### C.     Ms. Withrow Also Has Article III Standing to Sue All Defendants Because the United States, Its Departments, and Agencies Are a Single Entity.

Defendants point to no case in which a plaintiff had standing to sue the United States but lacked standing to sue its component departments or agencies or their leaders, and Ms. Withrow is aware of none.

Courts have repeatedly recognized that there is no distinction between the United States and its agencies in the way there might be between a corporation and its separately-incorporated subsidiaries. For example, the Supreme Court has held that a judgment against the United States binds all its agencies and officials. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–03 (1940). It makes no sense to say that all of the agencies of the United States would be bound by a judgment against the United States in this case (which, again, is the proper defendant in this Title VII suit under 10 U.S.C. § 10508(b)(3)(C)), but that those agencies and their leaders should be

treated as separate persons for purposes of standing.

Because "[t]he United States of America is a single entity," this Court has rejected the United States' argument that where "different departments of the Government were involved, it must be deemed that the parties in the proceedings were not the same." *United States v. I.C.C.*, 221 F. Supp. 584, 589 (D.D.C. 1963). And because there is no juridical distinction between the United States and its agencies, this Court has held that when the United States is the plaintiff in a civil suit, the defendant may seek party discovery from its departments and agencies rather than treat them as non-parties subject to discovery only under Rule 45. *United States v. AT&T*, 461 F. Supp. 1314, 1330–33 (D.D.C. 1978).

## II.   VENUE IS PROPER IN THIS DISTRICT.

The Complaint alleges that venue is proper in the District of Columbia because this is the "judicial district in the State in which the unlawful employment practice is alleged to have been committed." 42 U.S.C. § 2000e–5(f)(3). Defendants argue that Ms. Withrow was required to file her claims in Illinois because her normal work site is in Illinois. Defendants are wrong.

### A.   Venue Is Proper In This District Because The Relevant and Material Decisions Were Made Here.

As Defendants' own cases recognize, venue in a Title VII case is proper "where the *decisions* and *actions* concerning the employment practices occurred." *Ani v. Zeldin*, No. 1:24-CV-3328 (JMC), 2025 WL 3482732, at *2 (D.D.C. Dec. 4, 2025) (quoting *Jones v. Hagel*, 956 F. Supp. 2d 284, 289 (D.D.C. 2018)). The places where a defendant's "decisions" and "actions" occurred need not be the same and either can establish proper venue. In such cases, this Court must examine "the material events that constitute the factual predicate for the plaintiff's claims," *Miller v. Insulation Contractors, Inc.*, 608 F. Supp. 2d 97, 102 (D.D.C. 2009) (quoting *Kafack v. Primerica Life Ins. Co.,* 934 F. Supp. 3, 6–7 (D.D.C. 1996)). As this Court has recognized, "venue

in the District of Columbia is not destroyed simply because decisions made within the District affected a plaintiff outside the District." *Vasser v. McDonald*, 72 F. Supp. 3d 269, 278 (D.D.C. 2014). There, the court held that venue was proper in the District because "though the impact of Dr. Batres's alleged discriminatory practices was felt in Florida, his decisions as the sole hiring authority for the relevant Florida regional manager position were made from the District of Columbia, which is where he worked for the VA." *Id.* That is what happened here.

As described in the Complaint, the governing decisions as to restroom use—the "material events," *id.*, that form the basis of Ms. Withrow's claims—were made in the District of Columbia. On January 20, 2025, President Trump issued his Executive Order in this district, and on January 29, the Acting Director of OPM issued the OPM Memorandum in this district directing each Defendant agency head to "[e]nsure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity." Compl. ¶ 158.

The President's Executive Order, and the OPM Memoranda and GSA Recission that implemented it, were the relevant and material "decisions" here. The discrimination by Ms. Withrow's employer and other federal agencies was the result of these decisions, as they collectively afforded no discretion to the Illinois National Guard, or other federal agencies. The directive to comply with the Executive Order's mandate to "[e]nsure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity" was duly implemented down the chain of command by all federal agencies, using identical language, without any revision or discretion. *See id.* ¶¶ 163–167 (describing the "Agency Implementation Actions").

As in *Vasser*, the relevant and material decisions were made in the District of Columbia. The fact that those decisions were implemented by persons outside the District does not destroy

-19-

venue here, just as the "administrative processes carried out by RCS human resources employees in Florida" after decisions were made in the District did not require venue in Florida in *Vasser*. *Vasser*, 72 F. Supp. 3d at 278. Other cases reach the same result. *See, e.g.*, *Johnson v. U.S. Dep't of Transp.*, No. 3:18-cv-02431-M, 2019 WL 7987679, at *2 (N.D. Tex. June 26, 2019) (venue proper in the District of Columbia, Texas, where plaintiff applied for employment, because "Plaintiff's claim is ultimately based on the FAA's decision to adopt a new hiring process, which was made in Washington, D.C.").

### B.    Defendants' Cases Are Inapposite.

Defendants' cited cases are readily distinguishable because none involved decisions made in the District of Columbia and implemented outside the District without discretion, as happened here. For instance, in *Troster v. Garland*, No. CV 20-3584 (BAH), 2021 WL 5865447 (D.D.C. Dec. 10, 2021), the plaintiff conceded that "'the real focus of this case' is what happened to her 'as a result of the [sexual assault]—the hostile work environment and ultimate constructive discharge,' which she only experienced in Quantico." *Id*. at *4 (alteration in original). The plaintiff alleged that there was a "pattern and practice" at the FBI Headquarters in the District that "perpetuate[d] a systemic problem of assault and harassment against women at the FBI by failing to investigate sexual assaults against female employees and allowing male agents to retire with benefits," but these were "almost entirely unconnected to plaintiff and involve[d] reports about the FBI disciplinary process that pre-date[d] the issues in [the] case by roughly a decade or more." *Id.* (cleaned up). By contrast, the decisions made in the District are the heart of this case.

Defendants' other cases are even farther afield. *See Robinson v. Potter*, No. Civ. A. 04-0890 (RMU), 2005 WL 1151429, at *4 (D.D.C. May 16, 2005) (disability case regarding accommodations at plaintiff's workplace in Maryland; only basis alleged for venue in the District

was the location of agency headquarters); *Donnell v. Nat'l Guard Bureau*, 568 F. Supp. 93, 94 (D.D.C. 1983) (defendants' affidavit established that "any decisions concerning plaintiff's responsibilities . . . were made at the Columbia Pike Office Building in Falls Church, Virginia, or at National Guard Headquarters in Arlington, Virginia"); *Darby v. Dep't of Energy*, 231 F. Supp. 2d 274, 278 (D.D.C. 2002) (defendants' affidavit explained that "the events described by the plaintiff occurred in the Ohio Field Office"); *Muldrow v. Garland*, Civ. A. No. 20-2958 (APM), 2021 WL 6844248, at \*2 (D.D.C. Oct. 26, 2021) (venue in the District improper because "all of the adverse actions that Plaintiff claim[ed] were carried out primarily, if not exclusively, by supervisors located in Florida and the effects of her claimed discriminatory and retaliatory treatment ha[d] their locus in Florida"). Moreover, even where such cases conclude that the location where discriminatory acts occurred establishes venue, none stands for the proposition that venue is precluded elsewhere if that location is where material discriminatory decisions were made.

### C. If The Court Finds That Venue Is Improper, This Case Should Be Transferred, Not Dismissed.

For the reasons described above, venue is proper in the District of Columbia. Nevertheless, if the Court disagrees and concludes that venue is improper, the Court should transfer the case to the Central District of Illinois. Section 1404(a) authorizes transfer of a civil action to any other district where it could have been brought "in the interest of justice." 28 U.S.C. § 1404(a). "Generally, 'the interest of justice' requires courts to transfer cases to the appropriate judicial district, rather than dismiss them." *Darby*, 231 F. Supp. 2d at 277 (citing *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466–67 (1962); *James v. Booz–Allen*, 227 F.Supp.2d 16, 24-25 (D.D.C. 2002)). There is no reason to depart from that principle here. *See Ani*, 2025 WL 3482732, at \*4 (transferring Title VII case because "[t]he typical path is the appropriate one here").

-21-

III.    MS. WITHROW STATES A TITLE VII CLAIM.

For federal employees, Title VII provides that "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination based on . . . sex. 42 U.S.C. § 2000e-16(a). While "this language differs from that of the [Title VII] provision governing private [and state and local government] employers, *see* 42 U.S.C. § 2000e-2(a)," the D.C. Circuit has "held that the two contain identical prohibitions." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). Ms. Withrow has pleaded a viable claim that the Restroom Policy violates Title VII by subjecting transgender employees to discrimination because of their sex.

A.    The Restroom Policy Discriminates Against Ms. Withrow and Other Transgender Federal Employees Based on Sex in Violation of Title VII.

Stating a Title VII sex-based disparate treatment claim requires plausibly alleging that "an employer intentionally treats some people less favorably than others because of their . . . sex." *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019) (internal quotation marks omitted). One way a plaintiff can make that showing is by identifying a "facially discriminatory policy." *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (explaining this type of evidence in an ADEA case). A facially discriminatory policy under Title VII subjects employees to adverse treatment, based *expressly* on a protected characteristic, that alters the "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). *See also Desmarais v. Wright*, No. 23-1541 (LLA), 2026 WL 523022, at *6 (D.D.C. Feb. 25, 2026) (plaintiff stated Title VII claim by alleging "Defendants' differential treatment altered the terms and conditions of his employment by subjecting him to a facially discriminatory policy" that made him "worse off"). In other words, a plaintiff must show both that (1) the policy expressly differentiates between employees based on sex resulting in a harmful outcome; and (2) that outcome is an "adverse employment action," which is a "disadvantageous, but not necessarily significant or substantial, change to a term, condition,

or privilege of employment." *Teran-Sanchez v. Stream Realty Partners, L.P.*, No. 23-CV-3189 (DLF), 2024 WL 4215673, at *2 (D.D.C. Sept. 17, 2024) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024), then citing *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022)). Here, the Complaint plausibly alleges a facially discriminatory Restroom Policy that alters the terms and conditions of employment for transgender federal employees, including Ms. Withrow.

### 1. Discrimination Based On Transgender Status Is Sex-Based Discrimination That Violates Title VII.

As the Supreme Court has held, discrimination against transgender employees necessarily constitutes discrimination because of sex under Title VII, regardless of how the term "sex" is defined. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 655-56, 683 (2020).[3] In *Bostock*, the Court recognized that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex," *id.* at 660, even assuming sex is "referring only to biological distinctions between male and female." *Id.* at 655. This is so because discrimination based on transgender status necessarily results from an employer "penaliz[ing]" a person assigned male at birth "for traits or actions that it tolerates in an employee" assigned female at birth and vice versa. *Id.* at 660. Put simply, if "changing the employee's sex would have yielded a different" employment outcome, then the challenged employment policy or practice discriminates based on sex. *Id.* at 659-60. Thus, Defendants' argument about the proper definition of the term "sex" is irrelevant; *Bostock* makes clear that employment discrimination against transgender people is a form of sex discrimination even using the Government's definition of sex.

---

[3] Defendants were bound by this principle long before the *Bostock* decision in 2020. *See Macy v. Holder*, EEOC Appeal No. 0120120821, 2012 WL 1435995, at *7 (Apr. 20, 2012) (EEOC decision holding that discrimination based on transgender status is sex discrimination under Title VII).

### 2.    The Restroom Policy Facially Discriminates Against Transgender Employees On The Basis Of Sex.

The Restroom Policy constitutes discrimination under Title VII because it expressly subjects transgender federal employees to sex-based differentiation that causes harm. There is no dispute that the Restroom Policy treats individuals differently based on their sex assigned at birth. People assigned female at birth may not use the men's restroom, and people assigned male at birth may not use the women's restroom. *See* Mot. at 21 (conceding that "[s]ex specific bathrooms are, by definition, differential treatment"). For the majority of employees, that expressly sex-based policy causes no harm, but for transgender employees, it does. In other words, the Restroom Policy not only treats transgender people differently; it treats them "worse because of sex." *Muldrow*, 601 U.S. at 354 (quoting *Bostock*, 590 U.S. at 658) (internal quotations omitted).

This is precisely the reason that Ms. Withrow does not challenge separate men's and women's restrooms generally—those restroom designations alone do not cause harm even though they treat people differently based on sex. Prior to the Restroom Policy, Ms. Withrow had no issues with restroom access when, like all other women (transgender and not transgender), she was permitted to use the women's restroom. The Restroom Policy, however, transforms those designations into sex-based distinctions that *do* cause harm—*but only* to transgender employees. It requires transgender employees either to disclaim their identity every time they use the restroom or, like Ms. Withrow, to take steps to avoid using the restroom. Either way the policy extracts a price from transgender employees. Ms. Withrow frequently has no useable restroom at work, causing logistical difficulties as well as physical harm and emotional distress, all of which have limited her ability to effectively perform her job. Compl. ¶¶ 168-17. Excluding transgender employees from restrooms consistent with their gender identity, as a practical matter, deprives them of any restroom at all. The attendant harms from lack of restroom access (or being forced to

reveal their transgender status and invite related harassment), as explained further in Section III.B, are more than sufficient to constitute an adverse employment action under Title VII.

To be sure, the distinct harm transgender employees like Ms. Withrow experience does not stem *exclusively* from sex but from "the confluence of two factors," *Bostock*, 590 U.S. at 671— sex and gender identity (*e.g.*, for Ms. Withrow, her male sex assigned at birth and her female gender identity). As *Bostock* explained, "[o]ften in life and law two but-for factors combine to yield a result." *Id.* at 672. For the Restroom Policy to violate Title VII, Ms. Withrow's sex assigned at birth does not have to be "the only factor [causing harm], or maybe even the main factor, but [if] it [i]s one but-for cause," then "that [i]s enough." *Id.* at 667.

Importantly, even though the Restroom Policy treats non-transgender men and non-transgender women differently, it does so in a manner that does not harm them and is therefore non-discriminatory. Non-transgender employees may continue to use restrooms that align with their gender identity without experiencing any disadvantage just as they did before implementation of the Restroom Policy. Consequentially, a finding that the Restroom Policy discriminates against transgender employees in no way requires courts to hold that gendered restrooms violate Title VII writ large or require "'asexuality []or androgyny in the workplace'" in the form of mandatory gender-neutral restrooms. Mot. at 21 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

The Restroom Policy necessarily harms transgender employees like Ms. Withrow, and it does so in a way that would not occur but for transgender employees' sex assigned at birth (or "biological sex"). The Policy therefore discriminates against them on the basis of sex.

### 3. Defendants' Arguments That the Restroom Policy Does Not Discriminate Based On Sex Are Meritless.

*First*, Defendants wrongly claim that Title VII does not prohibit the Restroom Policy's

"differential treatment" based on sex because the statute "permits employers to account for 'enduring' 'differences between men and women.'" Mot. at 21 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). Defendants (and amicus) make this argument by grasping at a general principle from equal protection law that has no bearing on Title VII. Under the Equal Protection Clause, sex classifications are subject to heightened scrutiny, which requires weighing the "governmental objectives" against the "discriminatory means employed," taking into account the possibility that differential treatment may be justified by biological differences. *See Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 60, 70 (2001). But heightened scrutiny is not part of Title VII, which prohibits all sex discrimination in employment, regardless of whether the discrimination would survive intermediate scrutiny under the Equal Protection Clause. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) (Title VII case involving biological differences in reproductive capacity); *L.A. Dept. of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978) (Title VII case involving real differences in average longevity in men and women).[4]

Title VII provides one specific and narrow exception as an affirmative defense to its prohibition against sex discrimination: when "sex . . . is a bona fide occupational *qualification*

---

[4] Defendants' argument is not saved by *Adams by & through Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022), which was about Title IX, not Title VII, and was based on a Title IX-specific exception to the "general prohibition on sex discrimination" found in the statute. *Id.* at 811 ("Title IX, *unlike Title VII*, includes express statutory and regulatory carve-outs for differentiating between the sexes when it comes to separate living and bathroom facilities, among others.") (emphasis added)). There is also a circuit split on this Title IX question. *Compare Adams*, 57 F.4th at 811-12 (holding that policy prohibiting transgender boy from using boys' restroom did not violate Title IX) *with Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (holding that policy prohibiting transgender boy from using boys' restroom violated Title IX) *and Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017) (concluding that similar restroom policy likely violated Title IX), *abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *see also A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) (declining to overrule *Whitaker* and noting the circuit split created by *Adams* and *Grimm*).

[(BFOQ)] reasonably necessary to the normal operation" of an employer's "particular business." 42 U.S.C. § 2000e-2(e) (emphasis added); *Johnson Controls*, 499 U.S. at 201 (recognizing that "[t]he BFOQ defense is written narrowly" and "restrictive [in] scope"). The statutory text of the BFOQ defense "prevents the use of general subjective standards" and requires "objective, verifiable requirements [concerning] *job-related skills and aptitudes*." *Id.* (emphasis added). Employees' ability to access a particular restroom is irrelevant to such job-related skills and aptitudes, so a BFOQ affirmative defense is not available here.[5]

*Second*, an employer's motivation for discrimination is irrelevant under Title VII. Defendants' assertion that "privacy and safety concerns" motivate the Restroom Policy and that "[s]ex-separate-spaces are not rooted in patriarchy" misses the mark entirely. Mot. at 21-22. Under Title VII, "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a [merely] discriminatory effect." *Johnson Controls*, 499 U.S. at 199. Indeed, discrimination against individuals is unlawful even when "motivated by a wish to achieve classwide equality" or any other benign purpose. *Bostock*, 590 U.S. at 663-64 (citing *Manhart*, 435 U.S. at 708).

Even if intent mattered under Title VII—which it does not—the well-pleaded allegations of the Complaint raise a plausible inference that the Restroom Policy is not legitimately rooted in privacy or safety concerns of cisgender employees but rather in animus against transgender people. *See* Compl. ¶ 156. (citing *Talbott v. United States*, 775 F. Supp. 3d 283, 330–32 (D.D.C. 2025); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1277 (W.D. Wash. 2025); *In Re: Administrative Subpoena No. 25-143-019*, 800 F. Supp. 3d 229, 232–33, 238 (D. Mass. 2025)). As plausibly

---

[5] In fact, restrooms are a required and basic amenity that employers must provide as a matter of federal health and safety law. 29 C.F.R. 1910.141(c)(1).

alleged in the Complaint, the government's preexisting inclusive restroom policies never "resulted in any . . . harm to non-transgender or non-intersex employees who shared restrooms with their transgender or intersex colleagues." Compl. ¶ 148.

Contrary to Defendants' assertion that the Restroom Policy is rooted in "ancient practices" and "common sense," Mot. at 22, non-discriminatory policies have in fact long been the dominant system for gendered restrooms, wherein individuals' chromosomes are not tested and people merely "use the bathroom that they feel is appropriate," resulting in "very few complaints," as the President himself recognized at the outset of his political career. Brooke Migdon, *Trump Once Said Trans People Should Be Able to 'Use the Bathroom They Feel Is Appropriate.' Where He Stands 10 Years Later*, PEOPLE (Apr. 23, 2026) (describing President Trump's opposition to North Carolina's 2016 HB2 law and his support for "leav[ing] it the way it is"), https://bit.ly/4d0jnnk. Prior to the Restroom Policy, transgender and intersex employees of the United States government "used restrooms consistent with their gender identity without incident." Compl. ¶ 13. Any "fears of increased safety and privacy violations" which the Restroom Policy purports to address are simply "not empirically grounded," as "[t]here is no credible evidence that allowing transgender people access to restrooms aligning with their gender identity jeopardizes the safety or privacy of non-transgender users of those restrooms." Compl. ¶ 138. Rather, as the Complaint plausibly alleges, it is the safety and privacy of *Ms. Withrow* and others similarly situated to her that are in fact jeopardized —by the Restroom Policy. *See* Compl. ¶¶ 134-37, 211.

*Finally*, the fact that the Restroom Policy discriminates against both transgender women and transgender men does not save the Policy, as *Bostock* made clear. Defendants claim that the Restroom Policy is "neutral" and treats "all persons the same" because everyone must use the restroom consistent with their sex assigned at birth. Mot. at 23-24. *Bostock* decisively rejected this

type of argument: Title VII "works to protect *individuals* of both sexes from discrimination" so it is no "defense for an employer to say it discriminates against both men and women because of sex." 590 U.S. at 659 (emphasis added). "[J]ust as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same." *Id.* at 662.

Defendants disclaim *Bostock*'s applicability because the Court expressly noted it was not addressing restrooms. Mot. at 23. But there is nothing remarkable about a court making clear it is answering only the question before it and not others. Nor do Defendants' contentions regarding a longstanding practice of separating public restrooms based on perceived sex or the backdrop against which Title VII was enacted make any difference. *See* Mot. at 22-23. *Bostock* expressly rejected the contention that "Title VII's plain text" is limited to future "applications some group. . . expected in 1964." *Bostock*, 590 U.S. at 678; *see also Oncale*, 523 U.S. at 79 ("[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

**B.      The Restroom Policy's Harm to Transgender Employees Constitutes an Adverse Employment Action Under Title VII.**

Having sufficiently pleaded that the Restroom Policy causes harm based on express sex discrimination, all that remains is for Ms. Withrow to plausibly allege that the harm stemming from the Restroom Policy constitutes an "adverse employment action." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). The standard for establishing an adverse employment action has significantly evolved in the past five years. In 2022, the D.C. Circuit, sitting *en banc*, overruled a quarter-century's worth of circuit precedent holding that a harm is actionable under Title VII "only if the employee suffered 'objectively tangible harm.'" *Chambers*, 35 F.4th at 872 (quoting *Brown*

-29-

*v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)). A few years later, the Supreme Court reached a consistent conclusion in *Muldrow*, holding that "[a]lthough an employee must show some harm . . . to prevail in a Title VII suit, she need not show that the injury satisfies a significance test," because "Title VII's text nowhere establishes that high bar." 601 U.S. at 350. Now, plaintiffs "must simply allege 'some harm respecting an identifiable term or condition of employment' to support a disparate treatment claim." *Abdelhamid v. Lane Constr. Corp.*, 744 F. Supp. 3d 10, 17 (D.D.C. 2024) (quoting *Muldrow*, 601 U.S. at 974).

### 1. The Harm Caused By The Restroom Policy Satisfies the *Muldrow* Standard.

The *Muldrow* test is easily satisfied here. The ability of federal employees like Ms. Withrow to use the restroom at work is plainly a condition of their employment. As the Supreme Court has made clear, Title VII "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment . . . in employment.'" *Oncale*, 523 U.S. at 78. Indeed, courts have found that "equal access to restrooms is a significant, basic condition of employment." *Roberts v. Clark Cnty. Sch. Dist.*, 215 F. Supp. 3d 1001, 1015–16 (D. Nev. 2016) (internal quotation marks omitted). For example, in one case a court found that the plaintiffs' "claim that female officers were prohibited from using the restrooms at [police] headquarters, and would instead have to go to nearby fast food establishments, constitutes . . . a 'disadvantageous' condition." *Ramos Martinez v. Puerto Rico*, No. 07-2026 (DRD), 2011 WL 13351065, at *5 (D.P.R. Feb. 15, 2011) (Lopez, Mag. J.); *see also Hinds v. PSEG Long Island LLC*, No. 23-CV-08701 (RER) (LGD), 2026 WL 266010, at *9 (E.D.N.Y. Feb. 2, 2026) (finding that a plaintiff met the elements of an employment discrimination claim when he was "forced to use a distant bathroom . . . while his less senior, white, colleagues . . . were permitted to work inside and use a nearby bathroom" (internal quotation marks omitted)).

-30-

That is exactly the situation in which Ms. Withrow finds herself if she needs to use the restroom while at one of the several facilities she frequents without a single-user restroom. *See* Compl. ¶ 173.

The Restroom Policy causes "some" harm to transgender federal employees and is, therefore, actionable under Title VII. *Muldrow*, 601 U.S. at 974. Even in cases that pre-date *Muldrow*, courts have concluded that "segregating bathroom access based on a person's transgender status constitutes a significant harm." *Roberts*, 215 F. Supp. 3d at 1015–16; *see also Martinez*, 2011 WL 13351065, at *5 (finding that unequal bathroom access on the basis of sex was sufficiently "disadvantageous" to support a Title VII claim). Ms. Withrow alleges being forbidden from using restrooms that align with her gender at work causes her to worry constantly about her ability to access a single-user restroom. Compl. ¶¶ 15, 170, 173. The campus on which Ms. Withrow primarily works has only one single-user restroom, and her role requires her to regularly visit facilities that do not have any single-user restrooms. *Id.* at ¶¶ 170, 173, 175. If Ms. Withrow needs to use the restroom while at one of those locations, she must stop her work and leave the facility. *Id.* at ¶¶ 173, 174. These logistical difficulties, in addition to causing physical and emotional distress, limit her ability to effectively perform her job and serve the soldiers of the Illinois National Guard. *Id.* ¶¶ 168-78. These circumstances force Ms. Withrow to limit her need to use the restroom by carefully monitoring and controlling her food and liquid intake while working, *id.* ¶¶ 175-76, putting her physical health at risk. *Id.* ¶ 137 (noting that "[f]ifty-four percent of transgender individuals have reported physical problems from avoiding restrooms at work or in public, including dehydration and continence issues").

These harms Ms. Withrow and other transgender federal employees experience echo those from classic forms of sex discrimination. In the not-too-distant past, women entering previously

all-male work environments "often discover[ed] that the facilities for women [were] inadequate, distant, or missing altogether." *DeClue v. Cent. Ill. Light Co.*, 223 F.3d 434, 437 (7th Cir. 2000) (Rovner, J., dissenting). This disparity could "affect their ability to do their jobs in concrete and material ways," even if it sometimes struck men as "of secondary, if not trivial, importance." *Id.* Indeed, Justice O'Connor recalled, "In the early days of when I got to the court, there wasn't a restroom I could use . . . anywhere near the courtroom." Justice Sandra Day O'Connor, *"Out of Order" At The Court: O'Connor on Being the First Female Justice*, NPR (Mar. 5, 2013), https://perma.cc/QC2A-ZDWY. Such harm is plainly cognizable under Title VII.

### 2.     The Government's Arguments to the Contrary are Meritless.

The Government attempts to avoid liability by obscuring the applicable standard. First, the Government ignores binding precedent from the D.C. Circuit, *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022), and the Supreme Court, *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), which "rejected the rule that the harm an employee suffers must be 'significant,' '[o]r serious, or substantial, or any similar adjective suggesting that the disadvantage . . . must exceed a heightened bar'" to make out a viable Title VII claim. *Richardson v. Nat'l R.R. Passenger Corp.*, No. 24-2517 (SLS), 2025 WL 1568198, at *5 (D.D.C. June 3, 2025). Despite this binding precedent, the Government relies on an incorrect, heightened standard. *See, e.g.*, *McCone v. Pitney Bowes, Inc.*, 582 F. App'x 798, 799 (11th Cir. 2014) (requiring the plaintiff to show "a serious and material change in the terms, conditions, or privileges of employment" (internal quotation marks omitted)). This Court should not accept the Government's invitation to apply the wrong standard. *See Richardson*, 2025 WL 1568198, at *5 (rejecting the Government's attempt to rely on pre-*Chambers-Muldrow* "precedent that no longer holds"). Moreover, *Sosa v. New York City Department of Education*, is factually and legally inapposite, addressing retaliation claims (to

which a more stringent standard applies) stemming from a policy requiring teachers to secure restroom break coverage from another teacher. No. 24-1396, 2025 WL 1276123, at *3 (2d Cir. May 2, 2025) (non-precedential summary order).

Second, the Government suggests that federal employees like Ms. Withrow must meet a higher standard than non-federal employees. They are wrong. The relaxed *Chambers-Muldrow* standard applies here, just as it applies to non-federal employees. Notwithstanding textual differences between Title VII's general prohibition on discrimination and the federal-sector antidiscrimination provision, the D.C. Circuit has held on numerous occasions "that Title VII places the same restrictions on federal . . . agencies as it does on private employers." *Bundy v. Jackson*, 641 F.2d 934, 942 (D.C. Cir. 1981); *see also Czekalski*, 475 F.3d at 363; *Barnes v. Costle*, 561 F.2d 983, 988 (D.C. Cir. 1977) ("[I]t is beyond cavil that Congress legislated for federal employees essentially the same guarantees against . . . discrimination that previously it had afforded private employees."). Indeed, the "D.C. Circuit precedent has long held that 'the two [provisions] contain identical prohibitions.'" *Wilson v. Noem*, No. 20-cv-100 (GMH), 2025 WL 1000666, at *20 (D.D.C. Apr. 3, 2025) (quoting *Czekalski*, 475 F.3d at 363).

This is not the first time the Government has argued that federal employees should be required to meet a more stringent standard of harm than their non-federal counterparts, and courts in this district have rejected the proposition at least a dozen times. *See, e.g.*, *Bain v. Off. of Att'y Gen.*, 648 F. Supp. 3d 19, 54 (D.D.C. 2022) (noting that *Chambers* "did not so much as hint that the private-sector and federal-sector discrimination provisions should no longer be construed alike"); *Ellis v. Noem*, No. CV 24-977 (EGS), 2025 WL 2732733, at *10 (D.D.C. Sept. 25, 2025) (explaining that the same theory the Government offers here "has been rejected by every judge on this Court to have considered it"); *Grays v. Noem*, No. CV 24-1809 (LLA), 2025 WL 2643421, at

-33-

*4 (D.D.C. Sept. 15, 2025) (accord); *Cameron v. Blinken*, No. 22-cv-0031 (CRC), 2023 WL

5517368, at *4 (D.D.C. Mar. 22, 2023) (accord). This Court must do the same.

### C.    Ms. Withrow Plausibly Alleges a Title VII Claim Against All Defendants.

Defendants argue that Ms. Withrow's Title VII claim is "overly broad" and should be

dismissed as to all Defendants except for the Adjutant General of the Illinois National Guard

because the National Guard is Ms. Withrow's sole employer. Mot. at 19, 26-28. Defendants, again,

ignore the class action context of this case, and so their argument fails (or, at the very least, is

premature).

As explained in Ms. Withrow's standing argument, Title VII itself requires naming all

relevant agency heads in a federal class action. *See supra* § I.B. Civil actions by federal employees

must be brought against "the head of the department, agency, or unit, as appropriate." 42 U.S.C.

§ 2000e-16(c). In a class action brought on behalf of transgender and intersex federal employees

across every department and agency of the Executive Branch, "as appropriate" necessarily means

naming the heads of all departments and agencies whose employees are proposed class members.

To hold otherwise would mean that a class representative could only seek relief on behalf of

employees of her own agency, rendering the class mechanism meaningless with respect to

government-wide discriminatory policies. Moreover, with respect to Ms. Withrow specifically, 10

U.S.C. § 10508(b)(3) expressly provides that the United States is the proper defendant in Title VII

suits brought by civilian National Guard employees. *See supra* § I.A; Compl. ¶ 30. Defendants'

reliance on *Elmore v. Burrows*, No. 21-cv-02347 (JMC), 2022 WL 7458796 (D.D.C. Oct. 13,

2022), for the general proposition that only the employing agency head is a proper defendant does

not override this specific statutory command. *See* Compl. ¶ 30; *supra* § I.A.[6]

---

[6] Further, unlike the *Elmore* plaintiff, here Ms. Withrow did not improperly sue her employer

Even in the wake of restrictions on "universal injunctions," class actions remain a viable path for obtaining broad relief against the United States. *See, e.g.*, *Trump v. CASA, Inc.*, 606 U.S. 831, 873 (2025) (Kavanaugh, J., concurring) (noting that a putative nationwide class action under Rule 23(b)(2) can obtain the same relief as a universal injunction). Indeed, even under Defendants' theory, to obtain meaningful, government-wide relief under Title VII for the class of federal employees that Ms. Withrow seeks to represent, the Complaint must name the leaders of the government agencies and departments who employed class members and who implemented and continue to enforce the Restroom Policy.

The cases Defendants cite are inapposite because none arose in the class action context. Defendants rely on *Al-Saffy v. Vilsack*, 827 F.3d 85 (D.C. Cir. 2016), and *Spirides v. Reinhardt*, 613 F.2d 826 (D.C. Cir. 1979), for the proposition that Title VII defendants must be in a direct employment relationship with the plaintiff. But both cases were individual suits, not class actions, and neither addressed the question presented here. *Al-Saffy* turned on whether a plaintiff was employed by the State Department under common-law agency principles. 827 F.3d at 96-98. *Spirides* turned on whether a contractor qualified as an employee under Title VII. 613 F.2d at 830-33. Neither case addressed who must be named as a defendant when a federal employee brings a class action challenging a government-wide discriminatory policy that was mandated and implemented by multiple departments and agencies across the Executive Branch. These decisions say nothing about the permissible scope of defendants to be included in a multi-agency Title VII federal class action.

Defendants' proposed approach is contrary to judicial efficiency and sound public policy.

---

department and a number of "Doe" defendants. *See Elmore*, 2022 WL 7458796 at *4.

If Ms. Withrow were required to limit her class to employees of the Illinois National Guard, and every other affected transgender or intersex federal employee were required to file a separate class action against the head of their own employing agency, the result would be dozens of duplicative lawsuits seeking identical relief from different courts all challenging the same discriminatory policies and actions under Title VII. That outcome directly contradicts the purpose of Rule 23 and creates unnecessary work for the courts and the parties. Where a government-wide policy causes identical harm to employees across every federal department and agency, a single class action against all relevant department and agency heads is the most efficient and legally sound way to resolve the dispute and end the discrimination. *See Arey v. Providence Hosp.*, 55 F.R.D. 62, 69 (D.D.C. 1972) (noting "policy of lenience in Title VII class status applications due to the public interest in favor of ending discrimination").

In sum, Ms. Withrow has adequately pleaded a Title VII claim against all Title VII Defendants.

## IV.     MS. WITHROW'S APA CLAIMS ARE PROPERLY BEFORE THIS COURT.

Ms. Withrow's APA claims are properly before this court because her Title VII and APA claims present distinct legal issues and request different relief. Defendants ignore that their actions have required that she bring both claims to secure full relief. Defendants refer to a "chain of administrative actions," Mot. at 18, that contribute to Ms. Withrow's harms. They are correct that the Government has taken numerous steps to unlawfully restrict Ms. Withrow's restroom use. But they are wrong that only one of these actions has a "direct impact" on Ms. Withrow. To obtain a complete remedy, Ms. Withrow needs relief from the OPM Memoranda and GSA Recission, in addition to relief from the implementation of the OPM Memoranda by the Illinois National Guard. The only way she can obtain it is with separate claims, because relief under Title VII alone is

inadequate to remedy Ms. Withrow's injuries. Even if she prevails on her Title VII claim, the unlawful OPM Memoranda and GSA Recission will remain in place, applying to all federal buildings that Ms. Withrow may visit. Moreover, without relief on the APA claims, even if discriminatory acts of the Illinois National Guard are enjoined, the agency will still be subject to the OPM Memoranda and GSA Recission, leaving Ms. Withrow to navigate conflicting policies and guidance regarding her legal rights and the restrictions that apply to her as an employee.

Ms. Withrow is entitled to APA review of the OPM Memoranda and GSA Recission because there is no applicable "special statutory review proceeding," and she lacks another "adequate remedy" for her harms. 5 U.S.C. §§ 703, 704. The "adequate remedy doctrine" exists "to avoid duplication of 'special statutory procedures for review of agency actions.'" *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1275 (D.C. Cir. 2005) (quoting *Darby v. Cisneros*, 509 U.S. 137, 146 (1993)). The Supreme Court has rejected a "restrictive interpretation" of that phrase, which would "run counter to" the APA's goal of "remov[ing] obstacles to judicial review of agency action." *Bowen v. Mass.*, 487 U.S. 879, 904 (1988). Section 704 forecloses an APA claim only where there is "'clear and convincing evidence' of a contrary legislative intent . . . [to] restrict access to judicial review." *El Rio Santa Cruz*, 396 F.3d at 1270 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)).

Here, the Title VII review scheme does not provide an adequate remedy for Ms. Withrow's injuries. Her APA claims challenge two memoranda promulgated by Defendant OPM that require all "Heads and Acting Heads of Departments and Agencies" to ensure that restrooms, among other spaces, are designated by "biological sex," Compl. ¶¶ 158, 159, as well as the recission of a nearly-decade old GSA bulletin that had interpreted the nondiscrimination requirements of federal law to require that transgender federal employees be permitted to use restrooms consistent with their

-37-

gender identity. *Id.* ¶ 161. These actions are not reviewable under Title VII, which reaches only employment discrimination by an employer. *See* 42 U.S.C. §§ 2000e-2(a)(1); 2000e-16(c).

Defendants suggest (Mot. at 18) Ms. Withrow's standing is "inextricably connected" to her Title VII claim, and therefore her APA claims are not permitted. But that is not the relevant inquiry: the question is whether Title VII gives her an adequate remedy to address the harms caused by the OPM Memoranda and GSA Recission. It does not. Even apart from her employer's discriminatory acts, Ms. Withrow is harmed by OPM's and GSA's arbitrary and capricious acts in promulgating the OPM Memoranda and GSA Recission.

Ms. Withrow may also continue to be affected by those memoranda at work. First, Ms. Withrow frequently must visit other federal buildings, not just those of the Illinois National Guard, as part of her work and will not be able to use the women's restroom. Compl. ¶ 13. The OPM Memoranda and GSA Recission govern those other facilities and, without their vacatur, Ms. Withrow is offered no relief in that respect. Second, rescinding the Illinois National Guard's Garrison Memorandum (Compl. ¶ 165) but leaving in place the OPM Memoranda and GSA Recission would not adequately protect Ms. Withrow's rights. The OPM Memoranda provides no discretion to all federal departments and agencies when designating restrooms, while the GSA Recission removes the protections that affirmed Ms. Withrow's right to use the restroom that aligned with her gender. Leaving those documents in place will create confusion and imperil Ms. Withrow's ability to use the restroom in National Guard and other federal buildings.

The cases cited by Defendants offer them no help because they do not address the circumstances here. While *Brown v. General Services Administration* states that Title VII creates an "exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination," 425 U.S. 820, 829 (1976), it does not prohibit federal employees

from bringing *other* claims before the Court; and indeed, where a plaintiff lacks "adequate remedy" under a statutory scheme, the APA allows judicial review. *See* 5 U.S.C. § 704. Nor did *Brown* address the situation here, where the employer's discriminatory acts were compelled by other defendants' administration-wide directive, and do not reflect the agency's exercise of its employment discretion.

Defendants' reliance on *EELC* is likewise misplaced. As a threshold matter, the APA claims there were rejected because the defendant was not an agency, *Ethnic Emps. of Libr. of Cong. v. Boorstin*, 751 F.2d 1405, 1416 n.15 (D.C. Cir. 1985), and no similar defect exists here. Moreover, the reasoning from that case actually supports Ms. Withrow: the court considered whether plaintiff's constitutional claims could be brought in a Title VII case, concluding that when "assertions clearly fall outside the scope of Title VII, and thus could not for the basis for an administrative complaint under that statute," additional claims are permitted. *Id.* at 1415. So too for Ms. Withrow's APA claims.

*Seneca v. Price*, 257 F. Supp. 3d 95 (D.D.C. 2017), and *Ahuruonye v. U.S. Dep't of Interior*, 312 F. Supp. 3d 1 (D.D.C. 2018), similarly provide little support for Defendants' argument. In *Seneca,* a plaintiff brought APA claims challenging the EEO administrative process regarding the investigation and adjudication of his Title VII claims. 257 F. Supp. at 96. The court ruled that because the plaintiff had "an adequate remedy at law… he [could not] invoke the APA" for such a challenge. *Id.* In other words, a plaintiff cannot use the APA to attack an adverse Title VII decision collaterally, or as an end-run around the ordinary process for Title VII claims. *Seneca* had nothing to do with an independent claim seeking to set aside a government-wide policy. And *Ahuruonye* involved APA claims for "employment and discrimination and retaliation" asserted against the plaintiffs' employer. 312 F. Supp. 3d at 14. Here, Ms. Withrow does not assert *APA*

claims against the Illinois National Guard, and she has no other remedy at law to challenge the OPM Memoranda and GSA Recission. Her APA claims should therefore be allowed to proceed.

## CONCLUSION

For all these reasons, this Court should deny Defendants' Motion to Dismiss. If the Court is inclined to grant the Motion in whole or in part, Ms. Withrow requests, in the alternative, leave to amend her Complaint.

Dated: April 28, 2026

Michelle Teresa García*
Priyanka Menon*
Roger Baldwin Foundation of ACLU, Inc.
150 N Michigan, Suite 600
Chicago, IL 60601
312-201-9740 ext. 319
mgarcia@aclu-il.org
pmenon@aclu-il.org

Kaitlyn Golden (D.C. Bar No. 1022111)
Madeline Gitomer (D.C. Bar No. 1023447)
Paul Wolfson (D.C. Bar No. 414759)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kgolden@democracyforward.org
mgitomer@democracyforward.org
pwolfson@democracyforward.org

Respectfully Submitted,

/s/ Shana Knizhnik
Shana Knizhnik (D.D.C. Bar No. 120840)
Harper Seldin*
Joshua Block*
American Civil Liberties Union Foundation
125 Broad St., New York, NY 10004
917-716-0609
sknizhnik@aclu.org
hseldin@aclu.org
jblock@aclu.org

Barbara Schwabauer*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, D.C. 20005
212-549-2515
bschwabauer@aclu.org

Michael Perloff (D.C. Bar No. 1601047)
Scott Michelman (D.C. Bar No. 1006945)
Laura Follansbee (D.C. Bar No. 1782046)
ACLU Foundation of the District of Columbia
529 14th Street NW, Suite 722
Washington, D.C. 20045
202-601-4267
smichelman@acludc.org
mperloff@acludc.org
lfollansbee@acludc.org.

/s/ Jonathan Gleklen
Jonathan Gleklen (D.C. Bar No. 443660)
Rachel Forman (pro hac vice pending)
Darrel Pae*
Sangeeta Shastry (pro hac vice pending)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202-942-5000
jonathan.gleklen@arnoldporter.com
rachel.forman@arnoldporter.com
darrel.pae@arnoldporter.com
sangeeta.shastry@arnoldporter.com

Allissa Pollard (pro hac vice forthcoming)
Christopher Odell (pro hac vice pending)
Arnold & Porter Kaye Scholer LLP
700 Louisiana Street | Suite 4000
Houston, TX 77002-2755
713-576-2451
allissa.pollard@arnoldporter.com
christopher.odell@arnoldporter.com

Summer Perez (pro hac vice forthcoming)
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
212-836-7314
summer.perez@arnoldporter.com

* Admitted pro hac vice