## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEANNE WITHROW,
*on behalf of herself and all persons similarly situated,*

          *Plaintiff,*

    v.

UNITED STATES OF AMERICA, et al.,

          *Defendants.*

Civil Action No. 1:25-4073-JMC

---

## Brief of Prospective *Amicus Curiae* Pride in Federal Service Opposing Defendants' Motion to Dismiss

---

**Rachel E. Green** (they/them)
D.C. Bar No. 1782152
KATZ BANKS KUMIN LLP
11 Dupont Circle NW, Suite 600
Washington, DC 20036
(202) 299-1140
green@katzbanks.com

*Counsel of Record for Proposed Amicus Curiae Pride in Federal Service*

*On the brief:*
Elena Rodriguez Anderson (she/her)
Hugh Baran (he/him)
KATZ BANKS KUMIN LLP
111 Broadway, Suite 1403
New York, NY 10006
(646) 759-4501
baran@katzbanks.com
anderson@katzbanks.com

1

# TABLE OF CONTENTS

INTEREST OF PROPOSED *AMICUS CURIAE* ......................................................1

INTRODUCTION .................................................................................................2

ARGUMENT .......................................................................................................4

  I. The Executive Order and Restroom Policy Stem From
a Long History of Policing Bathroom Access to Discriminate
Against Minority Groups. ...................................................................................4

    A.  The Lavender Scare and its Reliance on Bathroom Paranoia.......................6

  II.  Policies Like the Executive Order and Restroom Policy, which
prevent people from using the restroom that corresponds to their
gender identity, are proven to be deeply harmful. ...........................................10

    A.  The Executive Order and other restroom bans and restrictions
have been proven to harm transgender and nonbinary individuals. ..........10

    B.  There is no evidence of the harm defendants and their amici claim..........16

    C.  Executive Order 14168 has already caused harm to transgender,
nonbinary, and cisgender members of Pride in Federal Service................18

CONCLUSION ...................................................................................................24

# TABLE OF AUTHORITIES

**Other Authorities**

Amira Hasenbush et al., *Gender Identity Nondiscrimination
Laws in Public Accommodations: a Review of Evidence Regarding
Safety and Privacy in Public Restrooms, Locker Rooms, and Changing
Rooms*, 16 The Journal of Sexuality Research and Social Policy, 70–83,
72 (2019), https://doi.org/10.1007/s13178-018-0335-z ...................................9, 17

Brandon Truitt, *Woman says security guard at Liberty Hotel in
Boston confronted her in bathroom, asked her to prove gender*,
CBS News (May 7, 2025, 5:20 AM EDT),
https://www.cbsnews.com/boston/news/women-boston-liberty-hotel-
bathroom-gender/.................................................................................................15

Brian Aitken, *"No Men in Women's Bathrooms:" A multimodal
political discourse analysis of the Houston's Equal Rights Ordinance
(HERO)*, Office of Graduate Studies at UC Davis, 6–7 (2023),
https://escholarship.org/content/qt52b0z3kk/qt52b0z3kk.pdf ...........................6, 7

Christopher Wiggins, *Cis Woman Mistaken as Transgender Records
Being Berated in Bathroom*, The Advocate (May 26, 2023)
https://www.advocate.com/news/2022/11/01/cis-woman-mistaken-
transgender-records-being-berated-bathroom .....................................................15

David K. Johnson, *The Lavender Scare: The Cold War Persecution of Gays & Lesbians in the Federal Gov't* (2006) ...................................................................8

David Pilgrim, *Jim Crow Restrooms*, Ferris State University Jim Crow Museum, https://perma.cc/UG7Q-CXJN .............................................6

Equal Employment Opportunity Commission, *EEOC History: 1964–1969*, https://www.eeoc.gov/history/eeoc-history-1964-1969 .....................6

Ian Gaffney, *The Legacy of the Johns Committee*, University of Florida George A. Smathers Libraries (2009), https://perma.cc/3WKY-A76X ................................................................................7

Jo Yurcaba, *Minnesota teen says server forced her to prove her gender in restaurant bathroom*, NBC News (Aug. 12, 2025) https://www.nbcnews.com/nbc-out/out-news/minnesota-teen-says-server-forced-prove-gender-restaurant-bathroom-rcna224562....................15

Jody L. Herman et al., *Safety and Privacy in Public Restrooms and Other Gendered Facilities*, Williams Inst. at UCLA Law, 3–4 (Feb. 2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/ Trans-Bathroom-Access-Feb-2025.pdf................................................... 12, 13, 17

Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives*, 19(1) J. Pub. Mgmt. & Soc. Pol'y, 65, 75 (2013),

https://williamsinstitute.law.ucla.edu/wp-content/uploads/

Restrooms-Minority-Stress-Jun-2013.pdf ...........................................................14

Johanna Younghans Baker, *How holding your pee can rewire*

*your brain*, University of Michigan Medicine (June 23, 2025, 5:00 AM)

https://www.michiganmedicine.org/health-lab/how-holding-your-pee-

can-rewire-your-brain ...............................................................................13

Joshua Arrayales & Christy Mallory, *Hate Crimes and Violence Against*

*Transgender People in California and the US: A Review of Existing*

*Research*, Williams Inst. at UCLA Law, at 4 (March 2026),

https://williamsinstitute.law.ucla.edu/wp-content/uploads/Hate-

Crimes-Review-Mar-2026.pdf ............................................................11

Kai Jacobsen et al., *Misgendering and the health and wellbeing of*

*nonbinary people in Canada*, 25(4) Int. J. of Transgender Health, 816–830

(Nov. 2023) https://pmc.ncbi.nlm.nih.gov/articles/PMC11500516/#abstract1....19

Movement Advancement Project, *Equality Maps: Bans on Transgender*

*People's Use of Public Bathrooms & Facilities According to Their*

*Gender Identity* (2026) https://mapresearch.org/equality-map/bans-on-

transgender-people-using-public-bathrooms-and-facilities-according-

to-their-gender-identity/ .....................................................................10

iv

National Park Service at the Dwight D. Eisenhower Memorial, *Executive Order 10450: Eisenhower and the Lavender Scare*, https://perma.cc/5RWV-FK28 ..................................................................8, 9

National Task Force to End Domestic Violence, *National Consensus Statement of Anti-Sexual Assault and Domestic Violence Organizations in Support of Full and Equal Access for the Transgender Community* (Apr. 13, 2018), https://www.4vawa.org/ntf-action-alerts-and-news/2018/4/12/national-consensus-statement-of-anti-sexual-assault-and-domestic-violence-organizations-in-support-of-full-and-equal-access-for-the-transgender-community .......................................................18

Neil J. Young, *How the Bathroom Wars Shaped America*, Politico Magazine (May 18, 2016), https://www.politico.com/magazine/story/2016/05/2016-bathroom-bills-politics-north-carolina-lgbt-transgender-history-restrooms-era-civil-rights-213902/ ................................................................. 4, 5, 6

Odette Yousef, *Trump's anti-trans effort is an agenda cornerstone with echoes in history*, NPR (Feb. 6, 2025, 10:27 AM ET), https://www.npr.org/2025/02/06/nx-s1-5288145/trump-anti-trans-executive-order ..................................................................................11

Phoebe Godfrey, *Bayonets, Brainwashing, and Bathrooms: The Discourse of Race, Gender, and Sexuality in the Desegregation of Little Rock's Central High*, 62(1) The Arkansas Historical Quarterly, 42–67 (2003), https://www.jstor.org/stable/40023302 ..........................................5

Rebecca Kranz, *Symptoms of Dehydration: What they are and what to do if you experience them*, Harvard Health Publishing (Jan. 2, 2024) https://www.health.harvard.edu/healthy-aging-and-longevity/ symptoms-of-dehydration-what-they-are-and-what-to-do-if-you- experience-them...................................................................................13

Robert R. Weyeneth, *The Architecture of Racial Segregation: The Challenges of Preserving the Problematical Past*, 27:4 The Public Historian, 11–44 (2005), https://scholarcommons.sc.edu/cgi/viewcontent.cgi?article= 1198&context=hist_facpub ...................................................................5

Sebastian Mitchell Barr et al., *Posttraumatic stress in the trans community: The roles of anti-transgender bias, non-affirmation, and internalized transphobia*, 9(4) Psych. of Sexual Orientation & Gender Diversity 410–421 (2022), https://psycnet.apa.org/doiLanding?doi=10.1037%2Fsgd0000500....................19

Tatiana Palotta Minari & Luciana Pellegrini Pisani, *Skipping*

*breakfast and its wide-ranging health consequences: A systematic*

*review from multiple metabolic disruptions to socioeconomic factors*,

141 Nutrition Res. 34–45 (2025),

https://www.sciencedirect.com/science/article/abs/pii/S0271531725000946 .....13

Teresa Bonner, *A history of bathroom battles in the U.S.: Racism, sexism,*

*transphobia*, PennLive Patriot News (May 17, 2016),

https://perma.cc/QGY4-TEEX ...............................................................................7

The National Archives Foundation, *The Lavender Scare*,

https://archivesfoundation.org/newsletter/the-lavender-scare/...........................8, 9

Trudy Ring, *After Charlie Kirk's death, Trump Jr. falsely claims trans*

*people more dangerous than al-Qaeda*, The Advocate (Sept. 11, 2025),

https://perma.cc/6T8C-G5P3..............................................................................11

Tynslei Spence-Mitchell, *Restroom Restrictions: How race and*

*sexuality have affected bathroom legislation*, 28(S1) Gender

Work & Org. 14–20 (2021), https://doi.org/10.1111/gwao.12545....................5, 10

**Regulations**

GSA Bulletin 2016-B, Federal Management Regulation:

Nondiscrimination Clarification in the Federal Workplace, 81 Fed. Reg.

55148 (Aug. 18, 2016)........................................................................................16

*Guidance Regarding the Employment of Transgender Individuals in*

*the Federal Workplace*, OPM (Jan. 2017),

https://www.nrc.gov/docs/ML1702/ML17023A024.pdf .....................................16

## INTEREST OF PROPOSED *AMICUS CURIAE*[1]

Pride in Federal Service ("PFS") is a nonpartisan membership group of federal employees dedicated to supporting lesbian, gay, bisexual, transgender, queer, intersex, and asexual ("LGBTQIA+") current and former federal employees, contractors, fellows, interns, retirees, allies, and more, with members who work in nearly every part of the federal government. The goal of PFS is to build community centered around LGBTQIA+ identity and issues in the federal workplace. Members of PFS come together to share resources and support, as many members face similar problems in the federal workforce. PFS is recognized as the anchor of federal LGBTQIA+ groups, affinity groups, and NGOs that focus on LGBTQIA+ individuals in public service. PFS also connects LGBTQIA+ individuals in public service with agency-specific LGBTQIA+ groups and other LGBTQIA+ individuals within their own agencies.

This case centers on whether all federal employees have the right to use the restroom that corresponds to their gender identity. In revoking that right, Executive Order 14168 directly harmed the members of PFS. PFS members who are transgender, nonbinary, or intersex immediately lost the right to use the bathroom

---

[1] Pride in Federal Service is a nonpartisan membership group. It has no parent corporation, and no publicly held company owns 10% or more of its stock. No counsel for a party authored this brief in whole or in part. And no person other than amici and their counsel made any monetary contribution intended to fund preparing or submitting this brief.

1

that matched their gender identity, which they were previously lawfully entitled to use. This has caused them tremendous physical and emotional harm, as detailed in Section II. Moreover, as described in more detail below, other members of PFS and allies of the LGBTQIA+ community were impacted by the restrictions of Executive Order 14168 as well.

## INTRODUCTION

This case is about the harm imposed by Executive Order 14168 on transgender,[2] intersex, and nonbinary people[3] and their allies on the one hand, and a boogeyman with roots in a long history of policing the restroom use of minority groups on the other.  Defendants and their *amicus curiae* claim that Executive Order 14168 (the "Executive Order") is meant to protect the safety of women federal workers. This argument stems from over a century of claims that allowing minority groups—first, Black Americans, and later, all LGBTQIA+ Americans—access to shared restrooms is dangerous. The Executive Order, and the Restroom Policy adopted to carry out its discriminatory mandate,[4] perpetuates the same type of

---

[2] Ms. Withrow provides definitions of "gender identity", "sex assigned at birth", "transgender man", "transgender woman", and "intersex"; we incorporate and rely on those definitions herein. Withrow Opp., ECF No. 45 at 5–6.

[3] As a shorthand throughout this brief, we often use the term "transgender", but this policy negatively impacts transgender, intersex, and nonbinary people alike. It also, as discussed in Part II.C below, causes harm to cisgender people whose gender presentation is not "traditionally" masculine or feminine.

2

unfounded paranoia and attitudes towards transgender, intersex, and nonbinary people as President Eisenhower's Executive Order 10450 fostered towards all gay and lesbian Americans during the Lavender Scare of the 1950s. And as with prior moral panics centered around restrooms, the Executive Order and the Restroom Policy rely on the surveillance and policing of one's peers.

There is no evidence that allowing Americans to use the restroom that corresponds with their gender identity poses any safety risk to any cisgender people, and indeed any safety risk to anyone other than transgender, nonbinary, or intersex people themselves, who are at risk of being the recipients of harassment for doing so. Nondiscrimination policies permitting people to use their preferred restroom have been in place in cities and states across the country for years and have resulted in no known safety issues. And as it relates to the case at hand, federal employees had the right for over eight years to use the restroom that corresponded with their gender identity, with no known harm to anyone else using the bathroom resulting from these policies. Conversely, the physical and mental harm of forcing transgender, nonbinary, and intersex people to use the bathroom corresponding to

---

[4] We use the term "the Restroom Policy" herein in the same manner as did Ms. Withrow's brief, to describe the "Agency Implementation Actions" taken by agencies throughout the federal government to implement two 2025 memoranda issued by OPM mandating compliance with the Executive Order, as well as the General Services Administration's rescission of its 2016 directive that federal agencies must allow individuals to use restrooms consistent with their gender identity. *See* Withrow Opp., ECF No. 45 at 10–11 (defining "the Restroom Policy" to include "The Agency Implementation Actions and the GSA Rescission").

3

their sex assigned at birth has been extensively documented. Few understand those harms better than the members of Pride in Federal Service, many of whom experienced the benefits of the Government's eight-year nondiscrimination policy, and have now experienced serious psychological and, in some cases, bodily injury, since the adoption of the Restroom Policy.

## ARGUMENT

I.  **The Executive Order and Restroom Policy Stem From a Long History of Policing Bathroom Access to Discriminate Against Minority Groups.**

The Executive Order and Restroom Policy, rooted in anti-transgender animus, are not the first policies to claim that minority groups' access to public restrooms must be restricted out of a purported concern for safety. They are only the latest development in a long history of policies restricting the ability of minority groups to use shared restrooms.

Governmental regulation of public restrooms has existed in the United States for more than one hundred years. The first known statute mandating sex-segregation of restroom facilities dates from 1887 in Massachusetts. *See* Neil J. Young, *How the Bathroom Wars Shaped America*, Politico Magazine (May 18, 2016), https://www.politico.com/magazine/story/2016/05/2016-bathroom-bills-politics-north-carolina-lgbt-transgender-history-restrooms-era-civil-rights-213902/. As with many laws seeking to restrict minority access to public facilities and to public life,

4

the Massachusetts law was in part a reaction to the widespread increased involvement of women in public life during and following the Industrial Revolution. *Id.*

Indeed, restroom policies are often associated with moral panic about the inclusion of minority groups. For example, around the same time, states began passing segregationist Jim Crow laws in earnest, and state laws enforcing racial segregation of public facilities, including public restrooms, proliferated. *See* Tynslei Spence-Mitchell, *Restroom Restrictions: How race and sexuality have affected bathroom legislation*, 28(S1) Gender Work & Org. 14–20 (2021), https://doi.org/10.1111/gwao.12545; Robert R. Weyeneth, *The Architecture of Racial Segregation: The Challenges of Preserving the Problematical Past*, 27:4 The Public Historian, 11–44 (2005), https://scholarcommons.sc.edu/cgi/viewcontent.cgi?article=1198&context=hist_fac pub. As civil rights advocates worked tirelessly to desegregate public accommodations throughout the United States, segregationists protested loudly— and often—about the dangers of integrating bathrooms for white women. Phoebe Godfrey, *Bayonets, Brainwashing, and Bathrooms: The Discourse of Race, Gender, and Sexuality in the Desegregation of Little Rock's Central High*, 62(1) Ark. Hist. Q. 42–67 (2003), https://www.jstor.org/stable/40023302. Just as restrictive restroom policies and laws today are enforced by social policing, so too were the

5

segregationist restroom policies. *See* David Pilgrim, *Jim Crow Restrooms*, Ferris State Univ. Jim Crow Museum, https://perma.cc/UG7Q-CXJN (explaining how segregation was not just enforced by statute, but by "everyday surveillance"). As Jim Crow was swept away, many of the earliest post-Title VII issues the EEOC tackled included desegregating restrooms, locker rooms, and similar single-sex work facilities. *See* Equal Employment Opportunity Commission, *EEOC History: 1964–1969*, https://www.eeoc.gov/history/eeoc-history-1964-1969.

### A. <u>The Lavender Scare and its Reliance on Bathroom Paranoia</u>

Lawmakers repurposed similar arguments about restroom safety beginning in the 1950s during the Lavender Scare to justify the targeting of LGBTQIA+ people, particularly in the federal government. Homophobic activists claimed that gay men posed unique threats to young boys and men in restrooms, stoking fears of a "homosexual menace" of gay men hiding out in public restrooms to target young boys. *See* Young, *How the Bathroom Wars Shaped America*, Politico Magazine; Brian Aitken, *"No Men in Women's Bathrooms:" A multimodal political discourse analysis of the Houston's Equal Rights Ordinance (HERO)*, Office of Graduate Studies at UC Davis, 6–7 (2023), https://escholarship.org/content/qt52b0z3kk/qt52b0z3kk.pdf. Much as segregationists argued that white women needed to be protected from Black women and Black men—and would be protected from them thanks to their segregated

6

restroom laws—lawmakers during the Lavender Scare relied on prejudicial ideas that gay men were pedophiles and that all gay and lesbian people were inherently sexual deviants to justify their anti-gay bathroom bans. *Id.*

These prejudiced and false claims about gays and lesbians persisted for decades. Indeed, gay people became an "easy target." In Florida, the Florida Legislative Investigation Committee (also known as the Johns Committee) operated from 1956 to 1965 with the initial goal of rooting out communists, but when they failed to do so, in an attempt to keep the Committee active, Committee Chair Charley Johns began to target gay men, seeing them as a more politically vulnerable target: "committee agents soon monitored private bedrooms and bathroom stalls instead of city buses." Ian Gaffney, *The Legacy of the Johns Committee*, University of Florida George A. Smathers Libraries (2009), https://perma.cc/3WKY-A76X. Chairman Johns then turned the Committee towards the goal of, among other things, expelling gay men from state universities as professors and as students. Under his leadership, the Committee issued a report that claimed gay men were a danger to public safety because they lurked in bathroom stalls and "posed a threat to the health and moral well-being of a sizable portion of our population, particularly our youth." Teresa Bonner, *A history of bathroom battles in the U.S.: Racism, sexism, transphobia*, PennLive Patriot News (May 17, 2016), https://perma.cc/QGY4-TEEX.

Anti-gay rhetoric emanated from the highest levels of the federal government during this time. Senator Joseph McCarthy, infamous for instigating the Red Scare, spurred a homophobic moral panic by claiming that homosexuals in government were a threat to national security because they could be blackmailed by communists and because they were "morally bankrupt." National Park Service at the Dwight D. Eisenhower Memorial, *Executive Order 10450: Eisenhower and the Lavender Scare*, https://perma.cc/5RWV-FK28.

President Dwight D. Eisenhower enacted Executive Order 10450 ("E.O. 10450") on April 27, 1953, deeming "sexual perversion," referring to homosexuality, as a threat to national security and banning the hiring of all gay and lesbian individuals in federal jobs. *Id.*; The National Archives Foundation, *The Lavender Scare*, https://archivesfoundation.org/newsletter/the-lavender-scare/. Pursuant to E.O. 10450, the federal government had the right to subject all federal employees to an in-depth investigation into whether that employee was homosexual. Such investigations were deeply invasive and subjective, and permitted the government to interview an employee's friends, family, and colleagues in search for "evidence" they were homosexual. *Id.*; *see generally* David K. Johnson, *The Lavender Scare: The Cold War Persecution of Gays & Lesbians in the Federal Gov't* (2006).

8

Ultimately, between 5,000 and 10,000 gay and lesbian individuals were either terminated or resigned from their jobs in the federal government as a result of this persecution. *See* National Archives, *The Lavender Scare*. The rule was in full effect for over twenty years, and E.O. 10450 was not repealed completely until 2017. *See* National Park Service, *Executive Order 10450*.

In addition to marshaling long-simmering fears around restrooms and public safety, the current Executive Order and Restroom Policy continue the long history of bathroom policing of minority groups—and most specifically, the long history of targeting LGBTQIA+ federal workers. The panic over the ability of transgender, intersex, and nonbinary people to use the restroom that corresponds to their gender identity is an evolution of arguments seeking to control and curtail the rights of LGBTQIA+ people to participate equally in public life. Indeed, "[a]s is the case of other issues of LGBT rights, many times these policies are seen as seeking solutions to problems that may not really exist, which may be linked to social perceptions of sexual and gender minorities as deviants." Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 J. of Sexuality Rsch. and Soc. Pol'y, 70–83, 72 (2019), https://doi.org/10.1007/s13178-018-0335-z.

9

Furthermore, "though different, trans[gender] women are still subject to many of the same negative [stereotypes] that surround homosexuality. These include but are not limited to: sexual perversion, venereal diseases, and that they are sexual threats in bathrooms." Spence-Mitchell, *Restroom Restrictions: How race and sexuality have affected bathroom legislation*, at 17. As discussed in Section II.B, *infra*, the Executive Order and Restroom Policy purport to "solve" a problem that does not exist. They are nothing more than an extension of a long line of discriminatory policies surrounding minority access to public restrooms.

II.     **Policies Like the Executive Order and Restroom Policy, which prevent people from using the restroom that corresponds to their gender identity, are proven to be deeply harmful.**

A.  <u>**The Executive Order and other restroom bans and restrictions have been proven to harm transgender and nonbinary individuals.**</u>

President Trump signed the Executive Order against a backdrop of increasing state laws banning nondiscrimination laws permitting transgender people to use the restroom that corresponds to their gender identity. *See* Movement Advancement Project, *Equality Maps: Bans on Transgender People's Use of Public Bathrooms & Facilities According to Their Gender Identity* (2026) https://mapresearch.org/equality-map/bans-on-transgender-people-using-public-bathrooms-and-facilities-according-to-their-gender-identity/ (map displaying all state laws that prohibit transgender people from using bathrooms and facilities according to their gender identity in certain circumstances or places). While

10

President Trump opposed such laws as recently as 2016, Withrow Opp., ECF No. 45 at 28, he now casts transgender people as dangerous. *See* Odette Yousef, *Trump's anti-trans effort is an agenda cornerstone with echoes in history*, NPR (Feb. 6, 2025, 10:27 AM ET), https://www.npr.org/2025/02/06/nx-s1-5288145/trump-anti-trans-executive-order. And his son and advisor, Donald Trump, Jr., claimed in 2025 that the "radical trans movement" is more dangerous than Al Qaeda. Trudy Ring, *After Charlie Kirk's death, Trump Jr. falsely claims trans people more dangerous than al-Qaeda*, The Advocate (Sept. 11, 2025), https://perma.cc/6T8C-G5P3.

Nationwide, following this increasingly inflammatory and hateful rhetoric, rates of hate crimes against transgender, intersex and nonbinary people are on the rise. *See* Joshua Arrayales & Christy Mallory, *Hate Crimes and Violence Against Transgender People in California and the US: A Review of Existing Research*, Williams Inst. at UCLA Law, at 4 (March 2026), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Hate-Crimes-Review-Mar-2026.pdf. National surveys of transgender people have found increasingly high rates of hate crimes, hate incidents, and violence against transgender people, particularly transgender women of color. *Id.* at 24. In fact, transgender people are four times more likely to be the victim of violence than to perpetrate it. *Id.* at 4.

Denying transgender, intersex, and nonbinary individuals the right to use the restroom that corresponds with their gender identity has been proven to cause them

11

physical and emotional harm. Nondiscrimination laws and workplace policies permitting transgender, intersex and nonbinary people to use the restroom that corresponds with their gender identity are critical to protect the health and safety of transgender, intersex, and nonbinary people. Significant numbers of transgender people report being denied access to a restroom in a public place, at work, or at school in the last year and report being verbally harassed, physically attacked, or experiencing unwanted sexual contact when accessing or using a restroom in the last year alone. *See* Jody L. Herman et al., *Safety and Privacy in Public Restrooms and Other Gendered Facilities*, Williams Inst. at UCLA Law, 3–4 (Feb. 2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Bathroom-Access-Feb-2025.pdf. Transgender individuals are significantly more likely to be denied access to a restroom and verbally harassed when they use the restroom that corresponds to their sex assigned at birth. *Id.* at 4.

The knowledge that they may be harassed, attacked, or denied access to the restroom leads transgender people to try to avoid using the bathroom when they need it, to avoid public places because of a lack of safe bathrooms, and to avoid going out in public at all. *Id.* at 5. Transgender people suffer significant harm to their bodily health as a result: more than half of respondents to the 2015 U.S. Transgender Survey reported not using the restroom when they needed to go, nearly one-third of respondents reported avoiding eating or drinking so as to not need the restroom, and

12

almost ten percent reported a urinary tract infection or kidney-related health problem in the last year alone. *Id.*

Fighting the need to go to the bathroom for long periods of time is demonstrably harmful to one's health: it can cause urinary tract and bladder infections, bladder stones, kidney issues, and weakening of the pelvic floor muscles. Johanna Younghans Baker, *How holding your pee can rewire your brain*, University of Michigan Medicine (June 23, 2025, 5:00 AM) https://www.michiganmedicine.org/health-lab/how-holding-your-pee-can-rewire-your-brain. Failing to stay hydrated throughout the day can cause headaches, dizziness, fatigue, and dry mouth. *See* Rebecca Kranz, *Symptoms of Dehydration: What they are and what to do if you experience them*, Harvard Health Publishing (Jan. 2, 2024) https://www.health.harvard.edu/healthy-aging-and-longevity/symptoms-of-dehydration-what-they-are-and-what-to-do-if-you-experience-them. Failing to stay fed can cause health issues including cognitive decline, mood disorders, obesity, cardiovascular risks, and inflammation. *See* Tatiana Palotta Minari & Luciana Pellegrini Pisani, *Skipping breakfast and its wide-ranging health consequences: A systematic review from multiple metabolic disruptions to socioeconomic factors*, 141 Nutrition Res. 34–45 (2025), https://www.sciencedirect.com/science/article/abs/pii/S0271531725000946.

Anti-transgender bathroom policies have also been proven to negatively impact transgender people's education, employment, and participation in public life. A survey of transgender people who worked in Washington, D.C. found that 13% of those who reported being denied restroom access and being verbally harassed at work by coworkers for their bathroom use also reported that it negatively impacted their employment. *See* Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives*, 19(1) J. Pub. Mgmt. & Soc. Pol'y, 65, 75 (2013), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Restrooms-Minority-Stress-Jun-2013.pdf. Negative employment impacts included having to change jobs or quit their jobs, poor job performance, excessive absences, and excessive tardiness. *Id.* Furthermore, the harm that stems from being forced to use more distant or inferior restrooms has repeatedly been found to qualify as an adverse employment action. Withrow Opp., ECF No. 45 at 30.

Banning people from using the restroom that corresponds with their gender identity is also harmful because of the way such bans must be enforced. In practice, the Restroom Policy requires surveillance of federal employees by their coworkers and supervisors—the exact kind of peer surveillance utilized by the government in enforcing Executive Order 10450. The Restroom Policy encourages individuals using the restroom to target those they believe are transgender, which effectively

14

leads to targeting anyone they do not believe complies with gender norms. This leads to instances of harassment of transgender people as described above, and it leads to harassment of others (including many lesbian and gay people, but also straight and cisgender people) who do not present as traditionally feminine or masculine. That has already occurred and been documented in other workplaces or public accommodations with similar bathroom bans. *See, e.g.*, Christopher Wiggins, *Cis Woman Mistaken as Transgender Records Being Berated in Bathroom*, The Advocate (May 26, 2023) https://www.advocate.com/news/2022/11/01/cis-woman-mistaken-transgender-records-being-berated-bathroom; Christopher Wiggins, *Lauren Boebert & Nancy Mace confront woman they thought was trans in 'predictable' bathroom incident*, The Advocate (Jan. 24, 2025) https://www.advocate.com/politics/mace-boebert-bathroom-mcbride; Jo Yurcaba, *Minnesota teen says server forced her to prove her gender in restaurant bathroom*, NBC News (Aug. 12, 2025) https://www.nbcnews.com/nbc-out/out-news/minnesota-teen-says-server-forced-prove-gender-restaurant-bathroom-rcna224562; Brandon Truitt, *Woman says security guard at Liberty Hotel in Boston confronted her in bathroom, asked her to prove gender*, CBS News (May 7, 2025, 5:20 AM EDT), https://www.cbsnews.com/boston/news/women-boston-liberty-hotel-bathroom-gender/.

**B. <u>There is no evidence of the harm defendants and their *amici* claim.</u>**

Ms. Withrow is seeking only to overturn the discriminatory Restroom Policy. Contrary to fearmongering by Defendants and their amici about locker rooms and purported feelings of safety of cisgender women, *see* Feds for Freedom Brief, ECF No. 29-1 at IV, this case has nothing to do with the appropriateness of separating bathrooms by gender generally, or the gender designation of facilities other than restrooms. Prior to the Executive Order and Restroom Policy, transgender, intersex and nonbinary federal employees like Ms. Withrow were permitted to use the restroom that corresponded to their gender identity with no reported issues. This had been the case for eight years, across three different presidential administrations including the first Trump administration, first following the issuance of GSA Bulletin 2016-B, Federal Management Regulation: Nondiscrimination Clarification in the Federal Workplace, 81 Fed. Reg. 55148 (Aug. 18, 2016), and subsequent directive by the Office of Personnel Management titled *Guidance Regarding the Employment of Transgender Individuals in the Federal Workplace* in 2017. OPM (Jan. 2017), https://www.nrc.gov/docs/ML1702/ML17023A024.pdf; Withrow Opp., ECF No. 45 at 9. During this entire time, transgender, intersex, and nonbinary federal

16

employees including Ms. Withrow used the restroom that aligned with their gender identity.

Indeed, nondiscrimination laws that permit individuals to use the restroom that corresponds to their gender identity have been shown to have zero negative impact on the privacy and safety of public restrooms.[5] *See* Herman, *Safety and Privacy in Public Restrooms,* Williams Institute, at 3; Hasenbush, *Gender Identity Nondiscrimination Laws in Public Accommodations*, at 78.

Specifically, analysis of data from the National Crime Victimization Survey shows that there is no evidence that transgender individuals having access to restrooms that accord with their gender identity increases risk of violent victimization. Herman, *Safety and Privacy in Public Restrooms,* Williams Institute, at 3. That is precisely why the National Task Force to End Domestic Violence, a coalition of dozens of national and state-wide organizations dedicated to ending sexual assault and domestic violence, issued a statement in 2018 unequivocally condemning policies ending nondiscrimination laws that protect transgender people's access to restrooms. *See* National Task Force to End Domestic Violence, *National Consensus Statement of Anti-Sexual Assault and Domestic Violence*

---

[5] As of 2026, 21 states and the District of Columbia fully and explicitly protect people from discrimination based on sexual orientation and gender identity in employment, housing and public accommodations, including restrooms. GLAAD, *Local Nondiscrimination Ordinances*, https://mapresearch.org/equality-map/local-nondiscrimination-ordinances/.

17

*Organizations in Support of Full and Equal Access for the Transgender Community*

(Apr. 13, 2018), https://www.4vawa.org/ntf-action-alerts-and-news/2018/4/12/national-consensus-statement-of-anti-sexual-assault-and-domestic-violence-organizations-in-support-of-full-and-equal-access-for-the-transgender-community. The Task Force explained that "nondiscrimination laws protecting transgender people's access to facilities consistent with the gender they live every day… have protected people from discrimination without creating harm. None of those jurisdictions [with such laws] have seen a rise in sexual violence or other public safety issues due to nondiscrimination laws." *Id.* No one is made safer by Executive Order 14168, because no one was in danger prior to its enactment.

**C.** **Executive Order 14168 has already caused harm to transgender, nonbinary, and cisgender members of Pride in Federal Service.**

As a nonpartisan membership group dedicating to supporting current and former federal employees and contractors who are LGBTQIA+, Pride in Federal Service ("PFS") is uniquely situated to share the impact of Executive Order 14168 on transgender federal employees and their allies. Numerous PFS members have reported experiencing the same difficulties that the broader research on bathroom bans has identified, including experiencing fear and anxiety around using the bathroom, feeling the need to avoid using the bathroom entirely, being denied the

18

use of the bathroom, traveling to use other bathrooms off-site or several floors away, and experiencing surveillance by coworkers or supervisors.

Multiple transgender members of PFS have been told by supervisors or others in leadership that, following the Executive Order, they would have to use the restroom matching their sex assigned at birth, even if they had previously been using the restroom matching their gender identity without incident. Not only does this policy require transgender PFS members to experience dysphoria, discomfort, and shame in using the bathroom that matches their sex assigned at birth but not their gender identity, but also this policy requires transgender PFS members to misgender themselves by doing so. The trauma and psychological harm of persistently being forced to identify with one's sex assigned at birth causes transgender, nonbinary, and intersex people considerable physical and emotional harm; these are not mere microaggressions. *See* Sebastian Mitchell Barr et al., *Posttraumatic stress in the trans community: The roles of anti-transgender bias, non-affirmation, and internalized transphobia*, 9(4) Psych. of Sexual Orientation & Gender Diversity 410–421 (2022), https://psycnet.apa.org/doiLanding?doi=10.1037%2Fsgd0000500; Kai Jacobsen et al., *Misgendering and the health and wellbeing of nonbinary people in Canada*, 25(4) Int. J. of Transgender Health, 816–830 (Nov. 2023) https://pmc.ncbi.nlm.nih.gov/articles/PMC11500516/#abstract1.

19

In many federal buildings, the single-occupancy, gender-neutral bathrooms remain available, but transgender PFS members have been instructed explicitly *not* to use them. For at least one PFS member who used a single-occupancy bathroom when the men's restroom she had been told she would have to use to comply with the Executive Order was closed for cleaning, her supervisor sent her an email reminding her that she was required to <u>only</u> use the men's restroom and could not use a single-occupancy bathroom.

As a result of being instructed that they cannot use the available unisex, single-occupancy restrooms despite their ready availability, and as a result of being forced to use only the restrooms matching their sex assigned at birth, many transgender PFS members have refrained from urinating during their work shifts to avoid using the required restrooms, citing the dysphoria and emotional distress they would experience when doing so. Other PFS members and federal employees have reported going to great lengths to use single-occupant bathrooms on other floors or in different buildings, costing them valuable time and energy during the workday. Others are able to use a single-occupant bathroom but must obtain a key every time to do so—an indignity and reminder, multiple times a day, that the government does not believe they really exist as a transgender person. Some PFS members reported that it takes about twice the time to travel to the single-occupant restroom as to the bathroom that corresponds with their sex assigned at birth, and experienced

20

"uncomfortable feelings of anger and disgust" every time they are forced to use the restroom that does not align with their gender identity. Yet other PFS members have reported that, where their buildings do not have gender neutral bathrooms available for their use, they travel to other buildings or other floors to use their gender-neutral bathrooms, and as a result constantly "worr[y] about getting in trouble." And yet, for many PFS members affected by the Executive Order, traveling longer distances to find a single-occupant or gender neutral restroom, the discomfort and time lost in such endeavors is less painful than the dysphoria caused by the mandated misgendering and the experience of using a restroom that does not match their gender identity.

Some transgender PFS members pass in their gender identity, meaning that the average person would not and/or does not perceive them to be transgender and would or does assume their sex at birth matches their gender identity. These PFS members worry about experiencing physical assault, "hav[ing] security called on [them], or being the subject of scrutiny or confusion of fellow restroom-users if they comply with the Executive Order. For these PFS members, using the bathroom of their sex assigned at birth would force them to out themselves to strangers as transgender to explain "why [they're] in the 'wrong' bathroom." Many PFS members are not "out" as transgender to their colleagues, so the Executive Order's implication of forcing these employees to "out" themselves is an additional harm.

To the extent Defendants claim the Executive Order serves privacy interests, there is no balancing of interests in Title VII, and in their rush to harm transgender, intersex, and nonbinary people, the Government has incidentally harmed cisgender people as well. For example, one PFS member, a cisgender full-time wheelchair user, reported feeling singled out when signs for the gender-neutral restrooms were covered up, because they too, had found the larger single occupant restrooms to be quite helpful. Another cisgender member, speaking as an ally to the transgender, nonbinary, and intersex community, reported limiting the meetings they scheduled in their work building because their building lacked gender neutral restrooms. They reported, "without gender neutral bathrooms, it's not a safe workspace at all, so I intentionally don't invite folks into this workplace. I make any in-person meetings elsewhere." And other PFS cisgender members whose gender presentations are more masculine or feminine than "expected" fear increased bathroom policing and being "wrong-bathroomed," or accused of being in the wrong restroom, at work following the Executive Order.

Another member described working on an initiative to construct a gender inclusive restroom in their office building for three years. Construction was completed a few weeks before the inauguration, and then employees were told it could not be labelled gender inclusive. As a result, the member had witnessed her transgender and nonbinary colleagues need to travel across multiple floors and

buildings to use the bathroom safely and "legally" (i.e., in compliance with the Restroom Policy). The respondent also received feedback from cisgender colleagues that the new rules blocked a plan to install a changing table in the gender-neutral restroom to allow parents of all genders to use it if they had their baby with them in the workplace.

These accounts of Pride in Federal Service members, both current and former employees, highlight the importance of the restroom policy that was in place before the Executive Order. Their stories demonstrate how critical being permitted to use the restroom corresponding to their gender identity, or at least a gender-neutral restroom, is to the safety and wellbeing of transgender, intersex, and nonbinary people on a daily basis. Several have no usable restroom in their place of work, and others have been disciplined and isolated for something as small as using an unused restroom, several floors away. Beyond affecting transgender, intersex, and nonbinary people, the issue of bathroom policing affects everyone, including people with disabilities, people who are stereotyped as being gender transgressive, and anyone who will suffer physical and psychological harm from being harassed by the social policing inherent to the enforcement of these bathroom policies. The harms Ms. Withrow describes in her complaint are, sadly, deeply familiar to members of PFS— and they only further demonstrate the serious injuries that Ms. Withrow and other

23

similarly impacted employees have experienced due to the discriminatory Restroom Policy.

## CONCLUSION

The discriminatory Executive Order and Restroom Policy continue a long, sad tradition of using bathroom access, and fears about such access, to discriminate against disfavored minority groups. They do not solve any "problem," but instead lead to serious psychological, bodily, and dignitary harm for transgender and cisgender federal employees alike.

For the reasons articulated by Ms. Withrow and for these additional reasons, Prospective Amicus Pride in Federal Service urges this Court to deny Defendants' Motion to Dismiss in its entirety and allow this lawsuit to proceed forthwith.

Respectfully submitted this 5th day of May, 2026.

By:    /s/ Rachel E. Green

**Rachel E. Green** (they/them)
D.C. Bar. No. 1782152
KATZ BANKS KUMIN LLP
11 Dupont Circle, Suite 600
Washington, D.C. 20036
(202) 299-1140
green@katzbanks.com

*Counsel of Record for Proposed Amicus
Curiae Pride in Federal Service*

24

Hugh Baran (he/him)*
Elena Rodriguez Anderson (she/her)*
KATZ BANKS KUMIN LLP
111 Broadway, Suite 1403
New York, NY 10006
(646) 759-4501
baran@katzbanks.com
anderson@katzbanks.com

*On the Brief

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of May, 2026, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record who are registered users of the ECF system.

By:    /s/ Rachel E. Green

**Rachel E. Green** (they/them)
D.C. Bar. No. 1782152
KATZ BANKS KUMIN LLP
11 Dupont Circle NW, Suite 600
Washington, D.C. 20036
(202) 299-1140
green@katzbanks.com

*Counsel of Record for Proposed Amicus Curiae Pride in Federal Service*